John A. BURNS, Governor of Hawaii, et al., Plaintiffs,

v.

Thomas P. GILL, Lieutenant Governor of Hawaii, Henrietta Davidson Holt, et al., Defendants,

George K. Noguchi, Intervenor-Plaintiff,

Richard P. Schulze, Jr., Intervenor-Defendant.

Civ. No. 2308.

United States District Court, D. Hawaii.

July 8, 1970.

Bertram T. Kanbarra, Atty. Gen., State of Hawaii, Nobuki Kamida, Deputy Atty. Gen., Honolulu, Hawaii, for plaintiffs.

Robert Dodge, Heen, Kai & Dodge, Honolulu, Hawaii, of counsel for defendant Gill.

Charles M. Tonaki, Chuck & Fujiyama, Honolulu, Hawaii, of counsel for defendant Holt.

James T. Funaki, Okumura & Takushi, Honolulu, Hawaii, of counsel for defendants Certain Members of the House of Representatives.

Yukio Naito, Honolulu, Hawaii, for defendants Certain Members of the Senate.

George K. Noguchi, pro se.

Richard P. Schulze, Jr., pro se, Moore, Torkildson & Schulze, Honolulu, Hawaii, of counsel, for intervenor-defendant.

Before JERTBERG, Circuit Judge, and PENCE and TAVARES, District Judges.

## DECISION ON THE LEGISLATIVE REAPPORTIONMENT PROVISIONS OF THE 1968 CONSTITUTION OF THE STATE OF HAWAII

PENCE, District Judge.

The prior history of Hawaii's reapportionment problems is fully set forth in Holt v. Richardson, 238 F.Supp. 468 (D.Hawaii 1965), and Id., 240 F.Supp. 724 (D.Hawaii 1965), and the same case, *sub nom.* Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

Pursuant to the April 25, 1966 Order of Remand of the Supreme Court, this three-judge court on August 17, 1966, ordered the State of Hawaii to take the steps necessary to formulate and enact a constitutionally permissible plan of state legislative apportionment. Thereafter, by legislative authority, the electorate of the State of Hawaii at the general election of 1966 voted that a Constitutional Convention should be held for the purpose of revising the Constitution of the State of Hawaii, and including therein a re-apportionment of the senate and house of representatives of the State. The 1967 legislature enacted mechanics necessary for a Constitutional Convention in the summer of 1968.[1] Thereafter, delegates to the Constitutional Convention, each running on a nonpartisan basis, were elected at a special election. Beginning July 15, 1968, 82 delegates, 63 from Oahu (the City and County of Honolulu), and 19 from the neighbor island counties, convened in Honolulu for 58 session days[2] and produced a revised Constitution. At the general election on November 5, 1968, that revised Constitution of Hawaii was adopted by the electorate of Hawaii.

At all times subsequent to August 17, 1966, this court has retained jurisdiction over the reapportionment of Hawaii's legislature.[3]

The reapportionment provisions of the 1968 Constitution brought about a realignment of parties plaintiff and defendant. Except for the portions thereof that permitted fractional voting, Governor Burns, together with intervenor Noguchi, supported the constitutionality of the reapportionment provisions of the Constitution. Lieutenant Governor Gill, as the present chief election officer of the State,[4] and former plaintiffs Holt and most of the State's senators and representatives together with intervenor Schulze, Chairman of the Committee on Legislative Apportionment and Districting of the Constitutional Convention, supported the constitutionality of all the new reapportionment provisions.

The constitutionality of Hawaii's reapportionment plan was heard by this court, beginning January 29, 1970. At the conclusion of the three-day hearing, in order that the Lieutenant Governor of Hawaii, as the chief election officer,

---

1. Act 222, Hawaii Sess.Laws 1967.

2. Gill, Ex. F.

3. In 1969 the Honorable William T. Beeks, Judge of the District Court of the Western District of Washington, a member of this three-judge court in 1965, withdrew and was replaced thereon by the Honorable C.

Nils Tavares, Judge of the District Court for the District of Hawaii. Judge Tavares had been disqualified from sitting on the previous panel because he had been a member of the 1950 Constitutional Convention that adopted the legislative apportionment provisions under attack in 1965.

4. *Cf.* Art. III, § 4, ¶ 10.

might have the maximum time in which to prepare for the 1970 elections, the court orally expressed its "present views" on the constitutionality of the reapportionment and redistricting provisions of the 1968 Constitution. The court then announced that a full decision would be forthcoming at a later date. This is that decision.

Article III, §§ 1–4, of the 1968 Constitution of the State of Hawaii, provide for a State legislature consisting of a 25-member senate and a 51-member house of representatives, and provide for the appointment of a Reapportionment Commission to reapportion both houses at 8-year intervals, commencing with the year 1973. The apportionment basis and criteria to be used in such reapportionment are also prescribed therein.

Article XVI, §§ 1–4, prescribe the legislative districting and apportionment of both legislative houses, effective until the next reapportionment.

Again [5] computing the same by the method of equal proportions, the members of each house were apportioned among the four basic island units, (1) Hawaii, (2) Maui, Lanai and Molokai, (3) Oahu, and (4) Kauai and Niihau, on the basis of registered voters in each (Art. III, § 4, ¶ 11). This paragraph also contains the express proviso that no basic island unit should be allocated less than one member in each house.

Article III, § 4, ¶ 12, "Minimum Representation for Basic Island Units," provides that the representation of any basic island unit initially allocated less than a minimum of two senators and three representatives shall be augmented with enough senators or representatives necessary to attain the minimum, with those legislators then each to exercise but a fractional vote.[6]

The 1968 Constitution thus presents for this court's approval, not only the old question of the validity of Hawaii's

(a) allocating its legislators among basic island units by the method of equal proportions, (b) on the basis of registered voters, but new ones of (c) fractional voting by certain legislators, and (d) a provision that no basic island unit can ever be entitled to less than one member in each house. Also to be determined is that question, ever present in reapportionment cases, viz., (e) are the variances between the districts in the number of registered voters therein such unjustified deviations from the ideal (i.e., the state or basic unit averages) number of electors per district as to violate the Equal Protection Clause of the Fourteenth Amendment?

■ The clear directions of the Court in Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed. 595 (1964) and Burns v. Richardson, *supra*, 384 U.S. at 83, 86 S.Ct. at 1292, are "that a court in reviewing an apportionment plan must consider the scheme as a whole. Implicit in this principle is the further proposition that the body creating an apportionment plan in compliance with a judicial order should ordinarily be left free to devise proposals for apportionment on an overall basis." Thus, no one particular area of deviation or variance from the ideal of absolute equality of voting power, per se, invalidates an apportionment plan. It is the effect of the totality of the scheme upon the one-man, one-vote objective that determines its constitutional validity. It is upon this foundation, then, that this court has weighed and evaluated Hawaii's reapportionment plan.

From the nature of the Convention's conception, the composition of its membership, its method of conducting its work, and from the time and effort spent by its delegates on all of the problems of reapportionment, it is manifest to this court that the Constitution formulated by the 1968 Convention was a good-faith

5. *Cf.* Art. III, § 4, 1950 Constitution.

6. Under the present reapportionment Kauai has but one senator, and it has been al-

located a second senator, with each of the two having but one-half vote (Act XVI, § 3).

effort to give to Hawaii the best and most workable constitution which those delegates could produce. Of the 82 delegates, most populous Oahu provided 63, Hawaii 9, Maui 6 and Kauai 4. Of those delegates, 35 were members of the State legislature—10 senators (2 Republican and 8 Democrat) and 25 representatives (5 Republican and 20 Democrat). 23 delegates made up the Committee on Legislative Apportionment and Districting (hereafter "Committee"), with Oahu given 17 members, Hawaii 2, Maui 3 and Kauai 1. On this Committee were 3 senators and 8 representatives. This Committee held 30 hearings, submitted its proposal to the whole Convention, and it was only after more than 15 hours of debate over a 3-day period that the apportionment provisions of the Constitution were adopted.[7]

In attempting to determine and structure what it intended to be the best possible apportionment plan for Hawaii, the Committee heard testimony from over 53 witnesses—political scientists, statisticians, attorneys and others—reviewed judicial decisions, analyzed apportionment and districting provisions of other state constitutions and reviewed numerous publications on the subject. Then, utilizing all those resources, the Committee formulated and adopted districting criteria.[8] The Committee engaged an independent team of computer programmers, a statistician, and appropriate staff members, and turned over to that team the primary work of formulating and analyzing districting plans. That team, using a computer upon data gleaned from the 1966 registered voter figures for election precincts, as well as corresponding census tracts, prepared various districting plans and maps according to the Commitee's criteria. No member of the Committee or any other delegate was involved in any preparation of the various plans. That team developed 39 house districting plans covering the several islands. No alternate plans were prepared for apportioning and districting the senate because the Committee felt that the senate districting plan, not disapproved in Burns v. Richardson, *supra,* was sound and acceptable, subject only to some minor boundary line adjustments in two urban Oahu districts.[9]

The foremost criterion, of course, was that the average number of registered voters per legislator shall be as nearly equal as possible.[10] In considering, as it

---

7. Gill, Ex. F.

8. Sup.Stand.Com.Rep.No.58 (hereafter "Report No. 58"), § 7c, pp. 25–29, Criteria Used by the Committee in Districting.
   (1) The average number of registered voters per legislator in every district shall be as nearly equal as possible.
   (2) No district shall extend beyond county boundaries.
   (3) Insofar as possible, districts are to be *contiguous* (*except multi-island districts*) and compact.
   (4) District lines must follow permanent and easily recognized lines * * * and should follow census tract lines where possible.
   (5) Wherever possible, the division of areas with a substantial community of interest (socio-economic) is to be avoided.
   (6) The submergence of small areas or groups within larger districts where substantially different socio-economic interests predominate is to be avoided.
   (7) Districts may not be so drawn as to unduly favor one person or political faction.
   (8) No multi-member house district shall have more than three representatives.
   (9) No single-member districts shall be created in highly urban areas.
   (10) Except where districts constitute entire islands or counties, the senate districts should be larger than representative districts, and senate district line should avoid cutting across a house district.

9. Testimony of Richard P. Schulze: attorney; district magistrate for the District of Honolulu; delegate to the 1968 Hawaii Constitutional Convention; chairman of its Committee on Legislative Apportionment; and special counsel to the City and County of Honolulu and its City Council reapportionment, 1969—TR 14–21, 27–29. Testimony of Robert Schmitt (for qualifications see Holt v. Richardson, 238 F. Supp. 468 at 473, n. 6), TR 39–47, Report No. 58, pp. 24–25.

10. Schulze, TR 22.

must, the totality of Hawaii's plan, this court cannot fault a single one of the other criteria used by the Committee nor the criteria subsequently adopted, as Art. III, § 4, ¶ 13, for future apportionment. It is claimed by no one, nor is there even an inference that the Committee and the Convention, using the best data then available, did not make a good-faith effort to achieve that degree of voter equality demanded by Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The criticism of the apportionment efforts of the State of New York, to be found in Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), cannot be made of the State of Hawaii.

*Use of Method of Equal Proportion*

Just as the kings of Hawaii organized the political structure of these islands and ruled thereunder for a hundred years, just as was approved and adopted thereafter by the Congress of the United States when it enacted Hawaii's Organic Act[11] in 1900, and just as was again reaffirmed and adopted by Hawaii's Constitutional Convention of 1950, so too did the Constitutional Convention of 1968 studiously and with due deliberation determine that the best means of apportioning its legislative representatives among its peoples in order to secure practical equality of suffrage was again to divide the State into its four basic political (county) units and use the two-tiered method of equal proportions to distribute its State legislators therein.[12] The 1968 Convention so acted with full awareness of the Court's caveat in Burns v. Richardson, *supra:* "Use of this method will not necessarily result in constitutional apportionment." 384 U.S. at 77, 86 S.Ct. at 1289, n. 4.

Before adopting the method of equal proportions the Constitutional Convention considered 19 other districting plans[13] but finally concluded that the method formerly used and again chosen was that which was calculated to give the fairest and best representation to each voter throughout the State.

Unique geographic, geological and climatic conditions within each basic island unit have produced markedly different patterns of economic development and occupational pursuits.

Oahu: wherein lies the State Capitol and its best harbors—truly urban—with all the internal stresses of a big city—freeways, traffic congestion, industrialization, pollution; high-rise buildings—pockets of intense population concentration, poverty areas, along with steadily diminishing agricultural lands and rural patterns of life.

Kauai: smallest and least populated, its peoples spread around the perimeter of but two-thirds of the island, with the wettest spot on earth in the center; a miniscule number of ethnically pure Hawaiians raising cattle on Niihau; sugar cane still dominant, but pineapple growing and canning disappearing, along with increasing resort development.

Maui: with almost all of the island's population on the west side of the 10,000-foot high crater of Haleakala, and, due to resort developments, increasing population growth on the Lahaina-Kaanapali side of the island; sugar, pineapples and cattle still dominant, but increasing resort development multiplying the island's economic problems.

Lanai: pineapples.

Molokai: pineapples and cattle.

Hawaii: much larger than all the other Hawaiian islands combined, but with three great and high mountains—Mauna Kea, Mauna Loa and Hualalai—, lava and rock encrusted, gigantic uncultivated land masses dominating the center of the island, with the lower but also uncultivated Kohala Mountains filling up a large segment of the north end; sugar cane still dominant, but with macadamia nuts,

11. Apr. 30, 1900, Ch. 339, 31 Stat. 141 (2 Supp.R.S. 1141).

12. Art. III, § 4, ¶ 11.

13. Schmitt, TR 41.

papayas and coffee furnishing employment to many; cattle lands decreasing; resort areas growing, with roads and water development as basic community headaches; except for Hilo, population to be found in a thin belt around the perimeter of the mountains.[14]

Each of the four basic island units of Hawaii is divided from its nearest counterpart by miles of open ocean channels. Alenuihaha Channel, dividing Hawaii and Maui is 29.5 miles wide. Kaiwi Channel, separating Molokai (one of the three islands making up the County of Maui) and Oahu (the City and County of Honolulu), is 26 miles wide. Kauai Channel, separating Oahu and Kauai, is 72.4 miles wide. No passenger vessels run over the waters separating the islands of the State of Hawaii. The only public means of interisland passenger transportation is by air.

As indicated above, the islands of Hawaii, Maui, Molokai, Oahu and Kauai are each quite mountainous, with sharp mountain ridges and small valleys with sheer cliff walls, creating geographical areas within each island separated by natural barriers which militate against simplicity of communication and travel. Within each county therefore are insulated groups of citizens who, because of local industry and land use, and resulting economic status, combined with the nature of the terrain, have developed their own and, in some instances, severable communities of interests.[15] The insular life has brought about an almost personalized identification of the residents of each county—with and as an integral part of that county. The residents take great interest in the problems of their own county because of that very insularity brought about by the surrounding and separating ocean.

All of the State's major TV stations are on Oahu; the two (by far) largest newspapers are printed on Oahu. Each concentrates its local news, almost exclusively, on Oahu. Thus the people on Oahu know little of the problems of the neighbor islands.[16] Although each other county has a daily paper, locally controlled, its circulation is almost exclusively confined to its county, creating even more insularity between the several island units.

No other state has such a simplified and centralized governmental structure as Hawaii.[17] Hawaii has but two levels of government: county [18] and state. The Hawaiian "county" is in fact but a municipality, with the counties having but a few of the normal municipal powers, e.g., police, firemen, water, sewer, waste disposal, street construction, traffic control, etc. The pay of county employees must be the same as pay for State employees.[19] Hawaii is the only state giving the State government statewide zoning authority. Any county zoning authority can act only within the perimeter of the state-mandated zones. Capital improvements programs are budgeted by the State with funds allocated to the counties for, e.g., highways, airports, harbors, schools, colleges, hospitals, health facilities, and all facilities for the judiciary.[20]

14. Report No. 58, p. 67, n. 33, Department of Planning and Economic Development, Tables 93, 94, 95.

15. Schmitt, TR 49–62.

16. Report No. 58, p. 67.

17. See Report No. 58, p. 67, n. 31.

18. The basic island units correspond almost precisely to the four counties of the State. See Holt v. Richardson, *supra*, 238 F.Supp. at 471, n. 1.

19. Doi, State Ombudsman, TR 100–05, 110–12; Art. VII, 1968 Constitution.

20. Mark, State Dir. of Economic Planning and Development, TR 75–78; Schulze, Ex. 12.

All welfare programs, prison and correctional programs, and housing authority are exclusively State administered.[21] All public health programs are solely under State control and operation. There are no county health departments.[22]

There are no municipal courts in Hawaii; all are State. All judges are appointed either by the Governor or the Chief Justice of the State Supreme Court. Each county has its own circuit[23] and district[24] courts, all paid by the State. All fines collected go into the State's general fund.[25]

Other than jurisdiction over local licenses and permits, in Hawaii 94% of all taxes are imposed, collected and administered by the State. Few taxes are earmarked; nearly all go into the State's general fund or the general fund of each county. The State's grants-in-aid are the major source of each county's revenue.[26] All decisions as to education are made at State level; there are no local school districts or boards. All expenditures for education come out of the State's general fund.[27]

This court is satisfied that Hawaii's uniquely centralized governmental structure, together with the other insular factors stated above, justifies the Convention's conclusion that if its voters are to have functional representation in their State legislature each basic island unit must be given meaningful recognition therein. The Committee worked on some twenty[28] different proposed districting plans and finally determined that any plan other than the one followed would have violated the natural community of interests to be found in any of the districts as presently created; would have prevented meaningful homogeneous groups of voters to be represented; and would have submerged, in many instances, minority groups in other districts, depriving them of any meaningful representation, even though numerically the scheme might appear perfect indeed.

The testimony of Robert Schmitt, State Statistician,[29] clearly illustrated that it was a practical impossibility to set up legislative districts on a state-wide plan on the basis of absolute numerical equality without conjoining areas on one island with areas on another, comprised of residents who had no fundamental community of interests and creating an expensive and difficult campaign problem for the candidates for those "interisland" districts and stultifying communication problems for those so elected.[30]

We cannot fault the basis upon which the lines of the districts were drawn within each basic unit.[31] There was absolutely no evidence whatsoever of any "systematic and partisan jerrymandering," as was found in Wells v. Rockefeller, *supra*. More than that, the Convention had unimpeachable justification for the district boundaries ultimately adopted.[32]

The members of the Constitutional Convention believed that equality of num-

21. Higa, Dept. Dir. Soc. Services, TR 82–88.

22. Loomis, Dept. Dir. Hawaii Dept. of Health, TR 89–96.

23. Court of original jurisdiction.

24. Magistrates, i. e., "local" courts.

25. Cingcade, Adm. Dir., Hawaii State Courts, TR 202–08.

26. Bennion, Ex. Dir. and Sect'y, Tax Foundation of Hawaii, TR 211–22; Schulze, Ex. 13.

27. Kiyosaki, Supt., State Dept. of Ed., TR 231–36.

28. TR 41.

29. TR 163–90.

30. Schmitt, TR 166–91; Schulze, Ex. 5–9.

31. Report No. 58, pp. 24–29; Schmitt, TR 42–67.

32. Schmitt, TR 42–67, 122–66.

bers could not be the sole criteria for determining equal representation in Hawaii's State legislature, and we find that belief has been here justified.

It is obvious from the record here that the Convention delegates apportioned Hawaii's legislature for the suffrage needs of Hawaii's people as reflected by the communities they live in, work in and vote in. We cannot and do not fault the Convention for giving those factors considered weight in defining the legislative districts of the State of Hawaii.

■ It was manifest to this court at the previous hearings, even though it may perhaps have not been quite so manifest to the Supreme Court, that in Hawaii the rigid implementation of the one-man, one-vote principle at the State legislative level, an end which could be achieved only by deliberately and artificially chopping up communities with mutuality of political interest and attaching them to other areas with no basic mutuality between the two whatsoever, would result in a complete loss of meaningful representation to a multitude of island voters. The evidence before us satisfies this court that the two-tier apportionment plan adopted by the Constitutional Convention, i.e., initially apportioning all representatives and senators among basic island units and thereafter drawing district lines within the islands themselves, *now* gives fuller and more meaningful representation to the voters of the several districts within each basic island unit than they could possibly have under any other scheme of apportionment.[33] This court reaches that result in spite of the fact that differences in the number of voters per district exist not only between the several districts within each basic island unit, but also exist between districts throughout the State. This court is satisfied that the geographical insularity and the past and present political and

social history of the several basic island units virtually compelled the Convention to adopt the method of equal proportions in districting the State of Hawaii.

■ This court finds that the use of the method of equal proportions in apportioning its legislature under the unique geographical, social and political realities of Hawaii, has not now brought about invidious results nor is it now constitutionally impermissible.

Again, as heretofore, no claim has been made by any party before the court (nor does it appear to this court) that the effect of applying the method of equal proportions in Hawaii has denied any person fundamental equality of suffrage, even though, as will appear hereafter, each and all of the representative districts created thereby vary in some percent from the ideal norm of voters per district, whether figured on a state-wide or unit basis.

*Registered Voter Basis*

The Constitutional Convention again reviewed in depth the question of whether registered voters could be the basis for apportionment or whether total population or other bases should be used.[34] Again for substantially the same reasons which this court found valid in 1965[35] and not invalidated by the Court in Burns v. Richardson, *supra,* 384 U.S. at 93, 86 S.Ct. 1286, registered voters was again adopted as the basis for Hawaii's apportionment.

As this court said in 1965, because of the fluctuating military and tourist population to be found in Hawaii, "if total population were to be the only acceptable criterion upon which legislative representation could be based, in Hawaii, grossly absurd and disastrous results would flow * * * "[36] The factors of

---

33. See this court's discussion of the problem of minimum representation, *infra.*

34. Report No. 58, pp. 11–21.

35. 238 F.Supp. 468, 473–476.

36. 238 F.Supp. 468, 474–475.

tourists and the military concentration in particular regions of Oahu, the Court reviewed in Burns v. Richardson, *supra,* 384 U.S. at 94–95, 86 S.Ct. 1286, are and apparently will be everpresent in Hawaii.[37] The problem of fluctuating tourist population has likewise now also affected certain areas on each of the counties outside of Honolulu.[38]

As before, there is nothing in the new State Constitution or the Hawaii Statutes which in any way inhibits the exercise of franchise by military or any other group of citizens. Neither then nor now have the military or tourists been excluded improperly from the apportionment base. Since this court's decision of 1965, legislation has been enacted to make it even easier than before for military and any other prospective voter to participate in the electoral process.[39]

As was testified by Gill, Lt. Governor and chief election officer,[40] following 1966 and continuing thereafter, the State of Hawaii not only engaged in broad-scale sampling (13,000 homes were contacted on Oahu) of neighborhoods to determine the actual voter population ratio, but also registrars were sent into areas where the registration appeared to be lower than average. Then, too, registrars were placed in central locations at shopping centers throughout the districts of the island to assist in increasing voter registration. Under the constitutional mandate of maximum representation, the Lt. Governor has been and clearly intends to continue the sampling and registration drives throughout the entire state on a virtually year-round basis.[41] When one sees that the registered voter turnout is around 90% on the neighbor islands and 80% on Oahu,[42] this court can only again conclude that the registered voter basis is not only a more accurate means of implementing the one-man, one-vote ideal for Hawaii but it also, in fact, implements that ideal far better than would the use of the total population basis for apportionment.

The record satisfies this court that the distribution of legislators on the chosen basis is not substantially different from that which would flow from the use of any other permissible population basis. All parties before us favor the continued use.

*District Disparities*

It is manifest that if meaningful representative districts are to be established in Hawaii, i.e., districts with easily distinguishable and definitive boundaries, corresponding whenever possible to census tracts, defined so as to give the maximum representation to all of the residents within an area, and avoiding submergence (with corresponding denial of representation) of minority elements within a district, the voter population of each district can never reach an absolute mathematical equality with the others. While this fact appears to have been grudgingly accepted by the Court,[43] it is a fact which was recognized by the Constitutional Convention as inevitable under Hawaiian conditions. Variations

---

37. Report No. 58, pp. 14–17.

38. Schmitt, TR 276–81, 292–94.

39. S.L.1966 Ch. 36, § 2 (H.R.S. 11–4); S.L.1968, Act 42.

40. TR 251–70.

41. TR 251–57.

42. Gill, TR 256.

43. Swann v. Adams, *supra,* 385 U.S. 440 at 444, 87 S.Ct. 569, 17 L.Ed.2d 501; Reynolds v. Sims, *supra,* 377 U.S. 533 at 597, 84 S.Ct. 1362, 12 L.Ed.2d 506; Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).

from mean average occurred in almost every district in each of the several basic island units and between the districts in those units with districts in other units. Some of these deviations upon a pure percentile basis superficially appear to be of such magnitude as to be impermissible. When one reviews the efforts made by the Constitutional Convention to secure practical equality and recognizes the forces at play in Hawaii which brought about the impartial selection by the Committee of the district lines, this court can but approve the individual districting as well as the overall result achieved by the Convention.

The Convention report,[44] as well as the testimony of Robert Schmitt,[45] unequivocally manifests the honest and sophisticated efforts of the Convention and its staff to establish districts of nearly equal voting strength, yet with clearly defined and meaningful boundaries embracing voting populations therein of some social and community significance within the several basic island units. The Convention broke down many of the pre-existing "historical political divisions" and instead drew district lines which were completely nonpolitically oriented. The lines as drawn in some instances were actually opposed by some incumbent legislators because it brought about a situation where two incumbents would be pitted against each other for a single position, in the 1970 elections.

In order to get the maximum benefit from the U. S. census, wherever feasible, census tract lines were used as district lines. The 1960 U. S. census figures, the State Department of Health's 1967 estimates of civilian de facto population, the 1966 general election voter figures, all were compared, analyzed and utilized.[46] The socio-economic survey of the State Department of Health, the many state and city land use and planning studies, likewise were factored. The boundaries and inhabitants of each district were painstakingly analyzed and measured against the Convention's criteria [47] before each district's lines were finalized.

In its endeavor to give each district its optimum equal yet meaningful representation, both single and multiple member districts were created.[48] No "monolithic political units" [49] were created.

Nevertheless, population variances between districts were inevitable. As Schmitt said, "Homogeneous areas do not come in neat packages of 5,082 voters." [50]

[51] As apportioned by the method of equal proportions, the basic island unit of Oahu, with 76.3% of the statewide, 1966, total registered voters of 253,242, was allocated 38 representatives and 19 senators; the basic island unit of Hawaii with 11.3% of the total registered voters was allocated 6 representatives and 3 senators; the basic island unit of Maui with 7.5% of the total registered voters was allocated 4 representatives and 2 senators; and the basic island unit of Kauai with 4.9% of the total registered voters was allocated 3 representatives and one senator.

Each *basic island unit's average* number of registered voters per legislator

---

44. Report No. 58, pp. 29–55.

45. TR 46–63.

46. *Id.* nn. 44, 45.

47. Report No. 58, pp. 25–29.

48. *Id.* at 32–35.

49. 240 F.Supp. 724 at 729.

50. Report No. 58, p. 31. 5,082 is the average number of voters per Oahu district, based on 1966 election figures.

51. This entire analysis following is taken from Report No. 28, pp. 43–45, 47, 48 as amended.

and the percent by which such average *deviated from* the *statewide average* number of registered voters per legislator, are as follows:

## HOUSE

| Island Unit | No. of Rep. | No. of Registered Voters | Island Average Registered Voters Per Representative | Percent Deviation from State Average of 4,967 [52] |
|---|---|---|---|---|
| Oahu | 38 | 193,107 | 5,082 | + 2.3 |
| Hawaii | 6 | 28,596 | 4,766 | − 4.1 |
| Maui | 4 | 19,029 | 4,757 | − 4.2 |
| Kauai | 3 | 12,510 | 4,170 | −16.1 |

## SENATE

| Island Unit | No. of Senators | No. of Registered Voters | Island Average Registered Voters Per Representative | Percent Deviation from State Average of 10,130 [53] |
|---|---|---|---|---|
| Oahu | 19 | 193,107 | 10,164 | + 0.3 |
| Hawaii | 3 | 28,596 | 9,532 | − 5.9 |
| Maui | 2 | 19,029 | 9,514 | − 6.1 |
| Kauai | 1 | 12,510 | 12,510 | +23.5 |

The overrepresentation in the house for the basic island unit of Kauai by −16.1% resulted when, by the method of equal proportions, the last representative seat was assigned to that basic island unit. Its underrepresentation in the Senate by +23.5% is caused by the inability of the island unit's 12,510 registered voters to command a second senate seat.

When the apportionment plans for both the house and the senate are viewed together, the following average number of registered voters per legislator for each basic island unit and the percent by which such average deviates from the statewide average is reflected:

| Basic Island Unit | No. of Legislators (Rep. & Sen.) | No. of Registered Voters | Island Av. No. of R.V. per Legislator | % Deviation from Statewide Av. No. of R.V. per Legislator (3,332) [54] |
|---|---|---|---|---|
| Oahu | 57 | 193,107 | 3,388 | +1.7 |
| Hawaii | 9 | 28,596 | 3,174 | −4.7 |
| Maui | 6 | 19,029 | 3,171.5 | −4.8 |
| Kauai | 4 | 12,510 | 3,127.5 | −6.1 |

---

52. Total statewide number of registered voters (253,242) divided by the total number of representatives (51).

53. Total statewide number of registered voters (253,242) divided by the total number of senators (25).

54. Total statewide number of registered voters (253,242) divided by the total number of representatives and senators (76).

The percentage by which the number of registered voters per representative in each district deviated from the average number of registered voters per representative follows. Two deviation percentages are given, one reflecting the deviation from the basic island unit's average and the other reflecting the deviation from the statewide average.

| | Rep. Dist. | No. of Reps. | No. of Reg. Voters | Reg. Voters per Rep. | % Dev. from Island Unit Av. No. of Reg. Voters per Rep. | % Dev. from Statewide Av. No. of Reg. Voters per Rep. (4965.53)[55] |
|---|---|---|---|---|---|---|
| Hawaii | | | | | | |
| | 1 | 1 | 4,377 | 4,377.0 | − 8.2 | −11.9 |
| | 2 | 2 | 10,115 | 5,057.5 | + 6.1 | + 1.9 |
| | 3 | 1 | 4,766 | 4,766.0 | 0.0 | − 4.0 |
| | 4 | 1 | 4,517 | 4,517.0 | − 5.2 | − 9.0 |
| | 5 | 1 | 4,821 | 4,821.0 | + 1.2 | − 2.9 |
| Maui | | | | | | |
| | 6 | 2 | 9,223 | 4,611.5 | − 3.1 | − 7.1 |
| | 7 | 2 | 9,806 | 4,903.0 | + 3.1 | − 1.3 |
| Oahu | | | | | | |
| | 8 | 2 | 10,449 | 5,224.5 | + 2.8 | + 5.2 |
| | 9 | 2 | 9,973 | 4,986.5 | − 1.9 | + 0.4 |
| | 10 | 2 | 10,449 | 5,224.5 | + 2.8 | + 5.2 |
| | 11 | 2 | 10,012 | 5,006.0 | − 1.5 | + 0.8 |
| | 12 | 3 | 14,949 | 4,983.0 | − 1.9 | + 0.4 |
| | 13 | 3 | 15,597 | 5,199.0 | + 2.3 | + 4.7 |
| | 14 | 2 | 10,155 | 5,077.5 | − 0.1 | + 2.3 |
| | 15 | 2 | 10,504 | 5,252.0 | + 3.3 | + 5.8 |
| | 16 | 2 | 11,099 | 5,549.5 | + 9.2 | +11.8 |
| | 17 | 2 | 9,137 | 4,568.5 | −10.1 | − 8.0 |
| | 18 | 2 | 10,363 | 5,181.5 | + 2.0 | + 4.3 |
| | 19 | 2 | 10,533 | 5,266.5 | + 3.6 | + 6.1 |
| | 20 | 3 | 14,812 | 4,937.3 | − 2.8 | − 0.6 |
| | 21 | 1 | 5,725 | 5,725.0 | +12.7 | +15.3 |
| | 22 | 2 | 9,296 | 4,648.0 | − 8.5 | − 6.4 |
| | 23 | 3 | 14,105 | 4,701.7 | − 7.5 | − 5.3 |
| | 24 | 3 | 15,949 | 5,316.3 | + 4.6 | + 7.1 |
| Kauai | | | | | | |
| | 25 | 3 | 12,510 | 4,170.0 | 0.0 | −16.0 [56] |

The Convention was fully aware that its apportionment scheme would and did bring about percentile deviations from the chimerical "norm."

As appears above, at the senatorial basis the deviation swing was from a +23.5 for Kauai to a −6.1 for Maui and a −5.9 for Hawaii. Oahu, with almost seven times the voting population of Hawaii, presented no problem and produced a de minimus +0.3 deviation.

55. Total statewide registered voters (253,-242) divided by the total number of representatives (51).

56. End of analysis taken from Report No. 58. See n. 51.

At first glance this senatorial deviation would appear to be "too much," [57] but here as well as in appraising below the deviations among representative districts, this court has before it a *state* legislative apportionment plan, the validity of which must be evaluated within the framework of Reynolds v. Sims, *supra*, 377 U.S. at 578–581, 84 S.Ct. 1362, 12 L.Ed.2d 506.

This court is satisfied that the Convention made a good-faith effort to achieve voting equality. The evidence discloses no expedient political compromises; partisan politics played no part in the scheme before us. There is no indication of any invidious attempt to deliberately construct districts with specific interest orientations. There appears here no gross disregard of population or voter figures for the sole purpose of recognizing regional or political groupings.

We have already found that the use of the method of equal proportions has been here and now validated for the State of Hawaii. There remains only the question: Are the percentile district deviations of its plan justifiedly permissible?

If the "Draconian judgments" [58] on the congressional apportionments of Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) and Wells v. Rockefeller, *supra*, were to be applied to Hawaii's State legislative apportionment scheme, both Hawaii's senate and house plans would not survive.

In its senate plan, only Oahu's deviation of +0.3 gives almost precise mathematical equality. It was achieved there only because the sheer mass of its voters made it simple to average out Oahu's 19 senators. Lacking such numerical mass and resulting flexibility, the much more sparsely populated units of Hawaii, Maui and Kauai simply could not fit anywhere nearly as precisely into the perfect norm.[59] In neither Hawaii nor Maui, however, is the actual and practical deviation of any material significance. The *total* number of voters actually affected on each is but some 600 who are given such ephemeral increase in voting power.

Kauai's senatorial voters, at first glance, seem more seriously shortchanged, but there, too, only some 2400 would seem to have a senatorial voting power loss. Any such "loss" however was deliberately and meaningfully compensated for by providing 3 representatives for those same Kauai voters, with a –16.0 deviation, a method recognized and tacitly approved by Reynolds v. Sims, *supra*, 377 U.S. at 577, 84 S.Ct. at 1389: "Apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house." As Schmitt's testimony clearly showed,[60] there is no community on Oahu which is truly comparable to any on Kauai and any attempt to conjoin part of Oahu's voting population with any or all of Kauai would be thoroughly impracticable and result in vote submergence of one or the other's grossly divergent interests.

It does not appear to this court that Kauai's equal-vote principle is now, in fact, diluted in any really significant way.

The percentile deviations in the house districts, like those of the senate, are more apparent than real. The swing is from a +15.3 (district 21, Oahu) to a –11.9 (district 1, Hawaii) and a –16.0 (district 25, Kauai) from the statewide average per representative. Yet in district 25, this means less than 800 voters are involved; in district 1, less than 600; and district 21, about 750.[61]

57. *Cf.* dissenting opinion of White, J., Wells v. Rockefeller, *supra*, 394 U.S. 542 at 553, 89 S.Ct. 1234, 22 L.Ed.2d 535.

58. Dissenting opinion of Harlan, J., Wells v. Rockefeller, *supra*, 394 U.S. at 549, 89 S.Ct. 1234.

59. *Cf.* Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

60. TR 166, 190.

61. Report No. 58, rev. p. 48.

Of the 25 representative districts painstakingly, intelligently and in good faith laid out for Hawaii's people, only 5 had less than +/−2.0% deviation from average. It would be surplusage to set forth in this decision, one by one, the justification given this court for each district variation.[62] Each variation was thoroughly analyzed and the basis for each was fully exposed to this court, as the record will clearly show.

■ This court finds that the reasons given for the several variations fully justify the districts created and the variations resulting. This court can only conclude that Hawaii's apportionment scheme was based substantially on population and the equal-population principle has not been diluted in any significant way.

Even if contrary conclusions could rationally be drawn from the evidence before us, this court agrees with Mr. Schmitt[63] that specifically as to Oahu, immigration into Hawaii and the mobility of its population is such that the percentile figure of today is meaningless tomorrow. The demand for housing on Oahu has been so great that so many fully-populated subdivisions have been built up since 1968 as to render almost every deviation percentile, throughout Oahu, meaningless.[64]

The population projections for the various neighboring islands and the amount of subdivision planning now going on in each such island,[65] likewise indicate that 1973 will demand a complete reevaluation of the present districting of each basic island unit.

This court is satisfied that for the purpose of setting up Hawaii's legislature, the percentile variations which were present as of the summer of 1968 are no longer meaningful, but nevertheless, as of 1970, the present districts do give Hawaii the most reasonable and practical implementation of the sought-for ideal of one-man, one-vote. The 1968 apportionment plan need not be stricken down.

If more were needed, in 1973, by virtue of the new constitutional requirement,[66] there must be a reapportionment of the State of Hawaii. The percentile deviations of 1968 and the unknown deviations of 1970 will undoubtedly be changed in 1973, and this court is satisfied that the Reapportionment Commission, just as the 1968 Constitutional Convention, will use every rational means to attempt to effectuate the optimum or "ideal" suffrage goal mandated by the Court.

*Fractional Voting*

The twelfth paragraph of § 4 of Art. III of the Hawaii Constitution, "Minimum Representation for Basic Island Units", provides:

"The representation of any basic island unit initially allocated less than a minimum of two senators and three representatives shall be augmented by allocating thereto the number of senators or representatives necessary to attain such minimums which number, * * * shall be added to the membership of the appropriate body until the next reapportionment. The senators or representatives of any basic island unit so augmented shall exercise a fractional vote, wherein the numerator is the number initially allocated and the denominator is the minimum above specified."

Inasmuch as the voter population of Kauai would permit but one senator to be allocated to that island unit, Art. XVI, § 3, provided that effective with the 1970 election and until the next reapportionment, one senator shall be added to the 25 members of the senate and

---

62. TR 122–63, 282–98; Report No. 58, pp. 49–54.

63. TR 289–91.

64. For example, this court will take judicial notice that in 1969 and 1970 new housing developments in district 21 have markedly increased the population of that district. The same statement is true of districts 17, 18, 20, 23 and 24. (TR 289–91.)

65. TR 276–88; Gill, Ex. 1.

66. Art. III, § 4, ¶ 1.

allocated to the basic island unit of Kauai.[67] Although Art. III, § 4, ¶ 12, initially could affect only the basic island unit of Kauai and its one senator, of course there can be no guarantee that at some future date it might affect a unit's representatives also. Conceivably a unit could be entitled to 3 representatives with ⅓ vote each.

The only formal objections to the complete ratification by this court of the apportionment provisions of the State Constitution arise over these provisions. Plaintiffs Burns, Noguchi, et al. maintain that all other voters outside of Kauai will as a matter of fact have their votes impermissibly diluted by such representation.

Defendants Gill, Schulze and Holt, and other supporters of the Constitution as passed, maintain that the Constitutional Convention clearly determined that the major work of the legislature is done in its committees and that in order to give the residents of any basic island unit effective representation, two representatives were the minimum possible to give effective coverage of senate committees and three were the maximum possible to give effective coverage of house committees. Upon this foundation the challenged sections were included in the Constitution. These proponents further argue that in the foreseeable future only Kauai will be affected and then only to the extent that two senators will divide its single vote for an unlimited but anticipatedly temporary period.[68] (At the present time Kauai has been allocated three representatives with no fractional

voting involved.) It is further argued that any advantage given Kauai does but compensate the Kauai residents voting power for the dilution caused by the "substantial positive deviation there."[69]

The plaintiffs maintain that although the two Kauai senators would hold but ½ vote apiece, thus giving Kauai its "one vote", senatorial voting and committee "coverage" are not the major factors of legislative representation. They point out that by giving Kauai two senators, it is possible that each could become a senate committee chairman; that each could possibly fill the leadership positions of both the majority and minority parties at the same time; that each would be entitled to full salary, per diem allowance and full staff, and that the staffing itself carries extra political power. They insist that it is upon and about the person of each legislator that the real power of legislative representation rests.

The problem of fractional voting is not new. When this same problem faced the New York and Louisiana courts,[70] fractional voting was rejected. Other courts considering the same problem have likewise frowned on fractional voting.[71] In the few cases where weighted or fractional voting has been sanctioned,[72] it has been under extraordinary circumstances such as faced the three-judge court in Seattle, Washington, in 1964, involving reapportionment of that state's legislature. That court decided to use fractional voting as a temporary form of reapportionment "because of the lateness of the hour * * *. We favor

67. The effect of all this was to give to Kauai two senators with ½ vote each beginning with the 1970 election and continuing at least until reapportionment.

68. TR 280.

69. Supplemental Memorandum of Schulze, p. 5.

70. WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 923–924 (S.D.N.Y.1965); Bannister

v. Davis, 263 F.Supp. 202, 209 (E.D.La. 1966).

71. Swann v. Adams, 263 F.Supp. 225 (S.D. Fla.1967); Jackman v. Bodine, 205 A.2d 735 (N.J.1964); Brown v. State Election Board, Okl., 369 P.2d 140 (1962).

72. Morris v. Board of Supervisors, 50 Misc. 2d 929, 273 N.Y.S.2d 453 (1966); Graham v. Board of Supervisors, 18 N.Y. 2d 672, 273 N.Y.S.2d 419, 219 N.E.2d 870 (1966).

this method as being the only feasible alternative in the event reapportionment is not accomplished by the [Washington] legislature." [73]

■ This court, feeling that the rationale of *WMCA, Inc.* and *Bannister* (n. 70) is sound and that there are no extraordinary circumstances present in the Hawaii reapportionment scheme and scene which permit of fractional voting, likewise cannot approve of the same.

The evidence before this court [74] makes it obvious that one senator, as a matter of fact, can adequately and successfully handle all of the committee assignments necessary to give full representation to the County of Kauai. The evidence also satisfies this court that a legislator's vote (per se) is not the major value of legislative representation. It has been compared to but the tip of the iceberg, and the evidence here makes it manifest that the major power of a legislator lies in his influence with and upon his fellow legislators, with his power as a committee member, as a committee chairman, and as a party leader. This court can but conclude that the effect of fractional voting, as reflected in Hawaii's 1968 Constitution, would in fact dilute the value of the votes of those living outside the County of Kauai, as well as, conceivably, *in futuro*, those living outside any basic island unit whose population, upon any future reapportioning, could not qualify for two senators or three representatives. Paragraph 12 of Article III, § 4, along with Article XVI, § 3, must be stricken down as constitutionally impermissible.

While none of the evidence before this court gave any indication whatsoever that it would at any time *in futuro* be necessary to invoke the last clause of ¶ 11 of § 4 of Art. III of the Constitution:

*"Apportionment Among Basic Island Units*

■ " * * * no basic island unit shall receive less than one member in each house.",

this court cannot permit that clause to stand. It is almost this very same phraseology which has uniformly caused otherwise acceptable constitutional provisions to be stricken down. [75] When the time comes that any one basic island unit is not entitled to be allocated one member in either house, then Hawaii's Constitution simply will have to be amended to set up a different basis for apportionment of Hawaii's legislators, than that now approved by this court.

Let judgment be entered as above set forth.

TAVARES, District Judge (dissenting in part):

I concur in every respect with the extremely able opinion written by District Judge PENCE, with the exception of that portion thereof contained in the next to the last paragraph under the heading "Apportionment Among Basic Island Units."

With the deepest respect to my brother judges, I do not believe that the time will ever come when one of the four basic island units will be down so low in number of registered voters as to call for the application of the provision of the last clause of ¶ 11 of § 4 of Article III of the Constitution reading,

" * * * no basic island unit shall receive less than one member in each house."

Theoretically, however, there could be a situation where the registered voter population of one of the basic island units would be so low that to give such unit even a single senator or representa-

---

73. Thigpen v. Meyers, D.C., 219 N.E.2d 870, 231 F.Supp. 938, 941 (1964).

74. TR 300-24.

75. "Carried too far, a scheme of giving at least one seat in one house to each

political subdivision * * * could easily result * * * in a total subversion of the equal-population principle." Reynolds v. Sims, *supra*, 377 U.S. at 581, 84 S.Ct. at 1391. WMCA, Inc. v. Lomenzo, 377 U.S. 633, 654, 84 S.Ct. 1418, 1428, 12 L.Ed.2d 568 (1964).

tive would be so unreasonable under all the circumstances as to render an apportionment based thereon invalid.

On the other hand, I don't believe that we can say in advance that there might not exist a situation where the deficiency in number of registered voters in a basic island unit was so small, that under this and other circumstances, including the distance between the basic island units, we should in advance rule out entirely the possibility of a valid reapportionment under this provision.

Therefore, I respectfully dissent from the last mentioned portion of the majority opinion to the extent above stated.