Beverly MORRIS; Joy Clarke Holmes; Joanne Oplustil, Plaintiffs,

v.

The BOARD OF ESTIMATE, the City of New York, Edward I. Koch, individually and as Mayor of New York, Andrew Stein, individually and as City Council President, Harrison J. Goldin, individually and as Comptroller for the City of New York, Howard Golden, David N. Dinkins, Stanley Simon, Clare Shulman, Ralph J. Lamberti, each individually and as Borough Presidents of the boroughs of the City of New York, Defendants,

and

Frank V. Ponterio, Intervenor-Defendant,

Robert A. Straniere, individually and as a member of the New York State Assembly, Intervenor-Defendant.

No. 81 CV 3920 (ERN).

United States District Court, E.D. New York.

Nov. 19, 1986.

Richard Emery, Arthur Eisenberg, New York Civil Liberties Union, New York City, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corporation Counsel, City of New York, New York City by Susan R. Rosenberg.

Frank V. Ponterio, Staten Island, N.Y., intervenor-defendant pro se.

Robert A. Straniere, Staten Island, N.Y., intervenor-defendant pro se.

Alan Rothstein, Citizens Union of New York, New York City, amicus curiae.

John J. Marchi, amicus curiae.

## OPINION AND JUDGMENT

NEAHER, Senior District Judge.

This action challenges the constitutionality of the New York City Board of Estimate ("Board"). Familiarity with previous decisions herein is assumed. *See Morris v. Board of Estimate*, 551 F.Supp. 652 (E.D. N.Y.1982), *rev'd*, 707 F.2d 686 (2d Cir.1983), *on remand*, 592 F.Supp. 1462 (E.D.N.Y. 1984).

■ In brief summary, plaintiff residents of the Borough of Brooklyn instituted this action contending that, pursuant to sections 61 and 62 of the New York City Charter, the allocation of one vote to each Borough President, as members of the Board, contravened the "one person, one vote" rule of the United States Supreme Court because of the widely disparate populations each Borough President represent-

ed. This court, following the remand, applied the test adopted by the Supreme Court in *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), and found a deviation of 132.9% as between the populations of Staten Island (Borough of Richmond) (352,121) and Brooklyn (2,230,-936). Such a large deviation—more than 10 times that permitted in *Abate* (11.9%, coupled with a caution)—strongly signalled that the Board's present voting allocation is unconstitutional. Mindful, however, of the Court of Appeals' instruction that this court "rule on the policies and interests which the Supreme Court has held may justify deviations," *Morris v. Board of Estimate,* 707 F.2d at 690, the parties were directed to submit a joint stipulation setting forth:

"(1) those *agreed* valid policies and interests presently served by the Board; and

(2) those *disputed* policies and interests which at least one defendant maintains are valid and are presently served by the Board...."

592 F.Supp. at 1477 (emphasis in original).[1]

## DISCUSSION

### I. *Justification Burden*

The Supreme Court has made it clear that the existence of malapportionment places the burden upon defendants. As the Supreme Court pointed out in *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983):

"A plan with larger disparities ... [than 10%] ... creates a prima facie case of discrimination and ... must be justified by the State."

Arguably, even were the disproportion explainable, defendants here might ultimately fail their justification task, since the Supreme Court has warned that immoderate inequalities may be intolerable whatever the meritorious objectives. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 581, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506 (1964) ("But if, even as a result of a clearly rational state policy ..., population is submerged as the controlling consideration in ... apportionment ..., then the right of all ... citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."); *Gaffney v. Cummings,* 412 U.S. 735, 744, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973) ("[T]he larger variations from substantial equality are too great to be justified by any interest so far suggested.").

Those warnings together with the huge 132.9% inequality afford a basis for the formidable charge by Citizens Union that the Board's voting plan is facially unconstitutional. *See, e.g., Preisler v. Mayor of St. Louis,* 303 F.Supp. 1071, 1075 (E.D.Mo. 1969) (The 135% deviation for aldermanic wards was beyond excusing.).

Still, despite its admonitions, the Supreme Court has never *established* a figure for per se illegality. Thus, in *Mahan v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973), the Virginia House of Delegates' 16.4% rationalized deviation was sanctioned, a guarded approval being left indefinite by the Supreme Court's comment that:

"While this percentage may well approach tolerable limits, we do not believe it exceeds them."

More recently, in *Brown v. Thomson,* 462 U.S. at 846–48, 103 S.Ct. at 2697–99, the majority upheld a plan for the Wyoming House of Representatives, the question presented having excluded an 89% disproportion from consideration. Joining that circumscribed decision, Justice O'Con-

---

1. Received along with the parties' current submissions was a request by Dr. John F. Banzhaf III to appear as an amicus curiae. Evidently, he has reviewed some of the litigation's latest documents but—oddly—not the 1984 decision settling the methodology and deviation issues. Correspondingly, Dr. Banzhaf's tender is largely directed at decided questions or manifests an analysis contrary to the law of the case. Therefore, given his after-the-fact orientation, Dr. Banzhaf's amicus offer must be declined. *See* 3A C.J.S. *Amicus Curiae* § 3, at 423 (1973) ("[T]he court may ... refuse [an amicus curiae motion], according as it deems the proffered information timely and useful....").

nor nonetheless emphasized that "clearly some outer limit" to acceptable disparities exists. *Id.* at 849–50, 103 S.Ct. at 2699–2700 (O'Connor, J., concurring).

Like the *Mahan* comment, however, Justice O'Connor's did not specify that "outer limit", obviously because one has not been set. In other words, though consistent with the cautionings against large deviations, these comments indirectly underscore that:

"[T]he [Supreme] Court has never enunciated specific maximum variations which will invalidate a reapportionment...."

*Boyer v. Gardner*, 540 F.Supp. 624, 629 (D.N.H.1982).

Viewed in that light, not reaching the yet unquantified question of facial unconstitutionality—if possible—is preferable and actually follows the Supreme Court's example.

"We are doubtful ... that the deviations [for the Texas House of Representatives] evident here [about 26%] are the kind of 'minor' variations which *Reynolds v. Sims* indicated might be justified by ... the maintenance of established political subdivisions.... ... But we need not reach that constitutional question, for we are not convinced that the announced policy ... necessitated the range of deviations between legislative districts.... ... [Among other deficiencies in its findings,] the District Court [did not] articulate any satisfactory grounds for rejecting at least two other plans ..., which respected county lines but which produced substantially smaller deviations from the principles of *Reynolds v. Sims.*"

*Kilgarlin v. Hill*, 386 U.S. 120, 123–24, 87 S.Ct. 820, 822–23, 17 L.Ed.2d 771 (1967). Fortunately, that restrained approach settles the equal protection challenge here. As will be seen, defendants fail their justification burden short of the per se query.

A. *Issues*

As pointed out in *Brown v. Thomson*, 462 U.S. at 843, 103 S.Ct. at 2696 (quoting *Mahan v. Howell*, 410 U.S. at 328, 93 S.Ct. at 987) the general justification stage investigation is:

"whether the legislature's plan 'may reasonably be said to advance [a] rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.'"

Dissenting in *Brown v. Thomson*, 462 U.S. at 852, 103 S.Ct. at 2701, Justice Brennan elaborated upon that basic inquiry. After a prima facie 10% variance demonstration, the remaining steps are:

"Second, a court must consider the quality of the reasons advanced by the State to explain the deviations. Acceptable reasons must be 'legitimate considerations incident to the effectuation of a rational state policy,' *Reynolds [v. Sims*, 377 U.S. 533,] 579 [84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964)], and must be 'free from any taint of arbitrariness or discrimination,' *Roman [v. Sincock*, 377 U.S. 695,] 710 [84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)]. See *Mahan v. Howell*, 410 U.S. 315, 325–26 [93 S.Ct. 979, 985–86, 35 L.Ed.2d 320] (1973). Third, the State must show that 'the state policy urged ... to justify the divergences ... is, indeed, furthered by the plan.' *id.*, at 326 [93 S.Ct. at 986]. This necessarily requires a showing that any deviations from equality are not significantly greater than is necessary to serve the State's asserted policy; if another plan could serve that policy substantially as well while providing smaller deviations from equality, it can hardly be said that the larger deviations advance the policy. See *e.g., Kilgarlin v. Hill*, 386 U.S. 120, 123–24 [87 S.Ct. 820, 822–23, 17 L.Ed.2d 771] (1967); *Mahan, supra*, [410 U.S.], at 319–20, 326 [93 S.Ct. at 982–83, 986] *Connor [v. Finch*, 431 U.S. 407,] 420–21 [97 S.Ct. 1828, 1836–37, 52 L.Ed.2d 465 (1977)]. Fourth, even if ... the deviations ... are justified ..., the court must nevertheless consider whether they are small enough to be constitutionally

tolerable. ... *Mahan, supra,* [410 U.S.], at 326 [93 S.Ct. at 986]."

As a minority opinion, Justice Brennan's explication is not controlling. In a larger perspective, however, his detailed guide is consistent with the majority's broad statement and cogently distills the Supreme Court's antecedent body of law.

Looking to that guide, the first step (the malapportionment stage) has been taken and the fourth (essentially a per se evaluation) will not be for reasons just given. The second and third steps are left, their respective issues being whether defendants' proffered policies and interests are valid concerning the Board, and if so, whether its current voting plan furthers them.

Regarding the validity issue, the Supreme Court has not precisely defined the characteristics of legitimate goals. *See Reynolds v. Sims,* 377 U.S. at 579, 84 S.Ct. at 1390; *Roman v. Sincock,* 377 U.S. at 710, 84 S.Ct. at 1458 (both *quoted in Brown v. Thomson,* 462 U.S. at 852, 103 S.Ct. at 2701, *supra* pp. 1466–67). *See also Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967) ("satisfactory explanation[s] grounded on acceptable state polic[ies]"); *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (objectives "consistent with constitutional norms"). *See generally Cohen v. Maloney,* 410 F.Supp. 1147, 1151 (D.Del.1976) (considerations "constitutionally acceptable").

Nor has it announced an all-inclusive list. *See Karcher v. Daggett,* 462 U.S. at 740, 103 S.Ct. at 2663 ("Any number of consistently applied legislative policies might justify some variance...."). *See generally* Tribe, American Constitutional Law, Ch. 13, § 6 (1978) ("[T]he scope of permissible justifications remains unclear.").

Nevertheless, the Supreme Court and lower tribunals have countenanced certain considerations germane here. *See generally* Charo, *Designing Mathematical Models to Describe One-Person, One-Vote Compliance by Unique Governmental Structures: The Case of the New York City Board of Estimate,* 53 Fordham L.Rev. 735, 803 (1985) ("Charo") ("[The] Board ... exhibits many, but not all, of the characteristics of local government that the Supreme Court has singled out for special protection from the stress caused by searching for perfect population equality.").

The furtherance issue explores (in part) whether another plan would "substantially vindicate" the identified rational objectives "yet approximate population equality more closely." *Karcher v. Daggett,* 462 U.S. at 741, 103 S.Ct. at 2664. If the answer is yes, the plan under review is constitutionally deficient. *See* Guido, *Deviations and Justifications: Standards and Remedies in Challenges to Reapportionment Plans,* 14 Urb. Law. 57, 68 (1982) ("Even though a rational state policy may justify population variances, the courts will not uphold a plan ... if an alternative ... achieves that policy with a lower level of deviation.").[2]

As relevant to those issues, defendants in the Joint Stipulation of Policies and Interests proffer these considerations in support of maintaining the status quo:

"1. Absence of any demonstrable injury to the populations of the more heavily populated boroughs as a consequence of requiring equal votes among the boroughs, particularly in light of the presence on the Board of three members—the Mayor, the Comptroller and the City Council President—who are elected by all the voters in all the boroughs, who each have two votes, and who in the aggregate outvote the five borough presidents.

2. Uniqueness of the Board as a form of local government because of its composition and voting allocation.

---

**2.** The parties' current submissions are not precisely reflective, but addressing the validity and furtherance issues was directed.

"[The litigants are to list those contested] policies and interests which at least one defendant maintains are valid *and* are presently served by the Board."
*Morris v. Board of Estimate,* 592 F.Supp. at 1477 (emphasis added). The parties' papers, in any event, adequately cover these questions.

3. Meaningful representation of the citizens of the lesser populated boroughs, especially Staten Island, in Board affairs.[3]

4. Preservation of the boroughs as legitimate representational entities in local government.

5. Use of natural and historical borough boundaries to define representational entities in local government.

6. Historical treatment of the boroughs as separate governmental entities.

7. Necessity of retaining borough representation on the Board in light of abolition of such representation on the City Council.

8. Effectiveness of a Board comprised of only eight members.

9. The long-standing dual role of borough representatives as both Borough Presidents and the member of the Board.

10. Coordination of City and borough governmental authority and responsibility.

11. Ability to balance differing interests and needs, and to accommodate development and long-term planning requirements of both the boroughs and the City as a whole.

12. Flexibility to meet changing societal needs, particularly in a large municipality whose local government is complex.

13. Correlation between the functions of the Board and the impact of those functions upon the boroughs, particularly in regard to the formulation of the capital budget, in order to assure that different parts of the City get their fair share of service contracts and capital budget allocation which might otherwise go to those portions of the City contributing the most tax dollars.

14. Necessity and effectiveness of borough representation in local government as an intermediate size entity, with city-wide representation being larger and community board representation being smaller.

15. Ability of the Board as presently constituted to eliminate undue concentration of executive power and to supplement the City Council, which retains the general legislative power of the City.

16. Effectuation of delegated police-power responsibilities.

17. Equality of voting power on the Board among the boroughs, as boroughs."

### 1. *Validity Issue*

■ Four of the foregoing policies and interests must be rejected as manifestly invalid.

### *No Injury (Number 1)*

The asserted absence of harm disregards the Supreme Court's decisions to the contrary. *See e.g., Chapman v. Meier,* 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) ("The basis for the District Court's allowance of the 20% variance [among senatorial districts for the North Dakota Legislative Assembly] is claimed to lie in the absence of 'electorally victimized minorities'.... ... [A] variance of this degree [in a court-ordered plan] cannot be justified simply because there is no particular racial or political group whose voting power is minimized or canceled. All citizens are affected when an apportionment plan provides disproportionate voting strength, and citizens in districts that are underrepre-

---

**3.** Unlisted Number 18 is Number 3 with "representation" replaced by "participation." In a quantitative reapportionment suit, such as this, *see Morris v. Board of Estimate,* 592 F.Supp. at 1465–66, the two terms are really one, participation being a function of representation.

"[R]epresentative government is in essence self-government through ... elected representatives ... and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature."

*Reynolds v. Sims,* 377 U.S. at 565, 84 S.Ct. at 1383. Number 18, accordingly, is subsumed under Number 3.

sented lose something even if they do not belong to a specific minority group.").

Directly put, the 132.9% variance evidences the harm—as have mathematical assessments of legislative designs since the early years of judicially mandated suffrage equality.

> "[O]vervaluation of the votes of those living here has the certain effect of ... undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor."

*Reynolds v. Sims*, 377 U.S. at 563, 84 S.Ct. at 1382.

Moreover, the political harm should come as no surprise to those defendants who were also parties in *Andrews v. Koch*, 528 F.Supp. 246 (E.D.N.Y.1981), *aff'd*, 688 F.2d 815 (2d Cir.), *aff'd sub nom. Giacobbe v. Andrews*, 459 U.S. 801, 103 S.Ct. 32, 74 L.Ed.2d 46 (1982). There, after isolating a 50.4% variance among these *same* boroughs under the City Council's former plan, this court said:

> "On the undisputed facts it is obvious that a voter in the Bronx or Staten Island gets substantially more representation for his or her ballot than a voter in Brooklyn or Queens. The effect is to deprive voters in the latter boroughs of an equal opportunity to participate in the political process."

*Id.* at 251.

Defendants' contention that no injury occurs, partially due to the city-wide members' supposed salutary effect on the disparity, is essentially an attempted relitigation of the malapportionment methodology and deviation issues. In deciding those issues, the court extensively examined and distinctly rejected the at-large mitigation argument, concluding that:

> "Nor does the city-wide presence dictate adjusting [the] methodology [to account for their alleged influence on the disproportion]. As prior decisions properly have done, the at-large representation should be eliminated from the deviation computation. That approach comports with the Board's existing theoretical relationships, with the common sense limitation on valid mathematical assessment and, ultimately, with the Supreme Court's guidance."

*Morris v. Board of Estimate*, 592 F.Supp. at 1475.

To be fair, the *perspective* of the city-wide representatives on the Board surely contributes to its performance. *See, e.g.*, New York State Charter Revision Commission Report at 84 (1975) ("The Board ... is well structured to make important political decisions and to resolve conflicts between city-wide and local interests. ... Its mixture of city-wide and borough officials provides a balanced perspective."); Kramarsky Aff. and Ex.: "The Kramarsky Study" at 115 ("These three officials are concerned with the welfare of the city as an entity; it is left to the Borough Presidents to add local ... opinion to the Board's deliberations. Needless to say, the Borough Presidents are equally as concerned with city-wide policy.... It must be recognized, however, that they are often subjected to more intense local pressures.").

In that vein, defendants have put forth *other* concerns enveloping the benefits of the at-large members' "big picture" orientation. *See* Joint Stipulation of Policies and Interests: Numbers 10, 11 and 13. In contrast, when proposing—as in Number 1—that the city-wide officials ameliorate the 132.9% disproportion so no inequality injury is incurred, defendants collide head on with elementary reapportionment jurisprudence and the law of this case.

### Uniqueness (Number 2)

The Board's purported uniqueness is likewise unavailing, although for discussion's sake its truth is assumed. *See* Professor Heywood T. Sanders' Sup. Aff. in Support

of Pl. Motion for Summary Judgment at 4 ("[The] Board ... has no precise analogue in other cities, as it constitutes the last example of a 'bicameral' local legislature."). *But see Morris v. Board of Estimate*, 592 F.Supp. at 1468 ("[T]he Board's *essential* [borough and at-large] electoral design is unexceptional....") (emphasis in original) (examples cited).

Cognizable considerations must have some political utility, as do "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. at 740, 103 S.Ct. at 2663. Uniqueness, a static quality, serves no such pragmatic purpose. *See generally, Reynolds v. Sims*, 377 U.S. at 579, 84 S.Ct. at 1391 ("legitimate considerations *incident to the effectuation* of a rational state policy") (emphasis added.).

### Police Power (Number 16)

Police power fares no better for a different reason. *See* Br. of I. Def. Ponterio at 27 ("The State ... has made it eminently clear that in delegating police power to municipalities it places great importance on such municipalities having strong and effective governments.") (citing N.Y. Const. art. IX, § 1 (McKinney 1969); N.Y. Exec. Law § 150 (McKinney 1982)).

Where uniqueness offered too little, police power offers too much. Presumably, *all* States desire strong local governments for facilitating the provision of municipal services. *See Avery v. Midland County*, 390 U.S. 474, 481, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968) ("[State l]egislators ... do not attempt to reach those countless matters of local concern.... [I]n providing for [local] governments ..., the States characteristically provide ... for decisionmaking at the local level.... ... In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life....").

That generality removes police power as a legitimate aim candidate. *See Karcher v. Daggett*, 462 U.S. at 741, 103 S.Ct. at 2663 ("The State must ... show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions.").

### Equal Borough Votes (Number 17)

The last consideration rejected is equal Board voting power for the boroughs. The one borough, one vote proposition clashes with the one person, one vote rule. The Constitution does not mandate identical votes for boroughs with widely disparate populations. *See Andrews v. Koch*, 528 F.Supp. at 249 (Rejecting a muted version of the same representational reasoning, this court said: "[T]he difficulty with defendants' position is that the Supreme Court has consistently adhered to quite different standards in assessing the conformity of electoral plans to constitutional requirements.").

It directs, instead, that any citizen shall have a vote equal to any other citizen—no matter the borough of either. *See Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972) ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.").

It is a citizen's right—not a borough's—which is the equal protection center of attention. *See Reynolds v. Sims*, 377 U.S. at 561, 84 S.Ct. at 1381 ("[T]he rights allegedly impaired are individual and personal in nature.... While the result of a court decision ... may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain ... citizens which constitutes an impermissible impairment of their constitutionally protected right to vote."). For this quantitative reapportionment case, the one person, one vote rule

means all *citizens* are to possess parity of franchise—not the Borough Presidents.

A subsidiary point is pressed to sustain the status quo.

"A change in the Board's composition and voting strength would be a breach of an implied condition under which [Staten Island] gave up its own self governance and entered into Greater New York in 1898 and would result in [its] residents ... being deprived of a chance to influence decisions which have a great impact upon their county's future."

Aff. of John J. Marchi at 19.

Obviously, any such tacit agreement has been nullified by post *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), caselaw. In 1968, the Supreme Court placed local governmental units within the equal protection mantle. *See Avery v. Midland County*, 390 U.S. at 478–79, 88 S.Ct. at 1116–18 ("The question ... is whether the Fourteenth Amendment ... forbids the election of local government officials from districts of disparate population. [W]e hold that it does."). In 1983, the Second Circuit did the same with the Board. *See Morris v. Board of Estimate*, 707 F.2d at 690 ("[T]he Board ... is selected by popular election and performs general governmental functions. The principle of one person, one vote is therefore applicable."). This latter day jurisprudence abrogated Staten Island's turn of the century, implied condition. Thus, in all respects, the equal borough votes consideration is not "constitutionally acceptable." *Cohen v. Maloney*, 410 F.Supp. at 1151.

■ Turning now to defendants' remaining policies and interests, these will be appraised in groups also as to their validi-

ty, and if weathering that issue, as to their furtherance by the Board's voting plan.[4]

*Historical (Numbers 5, 6 and 9)*

Since the 1898 consolidation, the boroughs have comprised the City. Correspondingly, since the 1901 Charter, the Board has reflected the metropolitan make-up with its Borough President membership.

Unquestionably, the City's government has centralized with authority moving from the boroughs. *See* Aff. of Loring McMillen at 6 ("[T]hrough several charter revisions, the powers of the Borough Presidents were decreased substantially with many responsibilities shifted to the Mayor."). Similarly, citizen-borough ties have loosened. *See* Aff. of Edward L. Sadowsky at 4–5 ("[T]here has been a considerable erosion in the identity which citizens make with the boroughs in which they live.... ... [T]he citizens of the Bronx and Brooklyn ... are likely [to] refer to themselves as coming from communities within a borough rather than the borough itself.").

Notwithstanding, whether primary residential referents or not, the boroughs are areas of dwelling. As such, they continue to be political entities for purposes of voting and representation in City affairs. Thus, the Board of Education, the Board of Trustees of the City University, the Industrial Development Agency, the Board of Elections and the Planning Commission are all statutorily required to have (appointive) borough representation. *See* N.Y. Educ. Law § 2590–b (McKinney 1981); *id.* § 6204 (McKinney 1985); N.Y. Gen.Mun. § 917 (McKinney 1986); N.Y.Elec. § 3–200 (McKinney 1978); New York City Charter & Ad. Code Ann. § 192 (Williams Press 1976), respectively.

---

4. Plaintiffs now acknowledge that, in the main, defendants' proposed aims are cognizable. At the same time, they stress that the 132.9% disproportion is unforgiven because optional plans, which foster the genuine objectives at lower variances, are available.

"The heart of plaintiffs' response ... is that a Board with an *equal* vote for ... each borough is unnecessary to satisfy the interests.... ... Since none of the concededly valid interests requires the [present] voting dilution ..., no justification exists for deviating from one person, one vote strictures." Aff. of Richard Emery and Ex. in Support of Summary Judgment at 32–33 (emphasis in original). While somewhat more resistant, Citizens Union does join plaintiffs for the most part. Regarding the remaining considerations, the court largely agrees with plaintiffs' revised view.

As with those City agencies, the Board's time-rooted membership evidences on-going borough residential-political consciousness. Against that background, history is a valid concern as to the Board. *See Abate v. Mundt,* 403 U.S. at 186, 91 S.Ct. at 1907 ("Rockland County defends its plan by asserting the long history of, and perceived need for, close cooperation between the county and its constituent towns.... For over 100 years, the five town supervisors were the only members of the county board, a system that necessarily fostered extensive interdependence between the towns and their county government.").

### Natural Boundaries (Number 5)

Entwined with the historical consideration is respect for natural boundaries, also a judicially recognized objective. *See Reynolds v. Sims,* 377 U.S. at 578–79, 84 S.Ct. at 1390–91 (mentioning it and other goals as potentially legitimate). When consolidated, the boroughs were mainly divided along geopolitical lines. *See, e.g.,* New York State Charter Revision Commission Report at 5 (1973) ("The borough of Manhattan was comprised of Manhattan, Governor's, Bedloe, Ellis, Oyster, Blackwell's, Randall's and Ward's Islands."). With its borough delegates, the Board retains a deference for those divisions. Heeding natural boundaries is an acceptable consideration.

### Integrity of Political Subdivisions (Numbers 4, 6, 7, 9 and 14)

For clarification, acknowledging the integrity of political subdivisions means accounting for the boroughs as subordinate governmental units. This category may be the strongest. *See Abate v. Mundt,* 403 U.S. at 185, 91 S.Ct. at 1906 ("[A] desire to preserve the integrity of political subdivisions may justify [a local government's] apportionment plan which departs from numerical equality...."); *Brown v. Thomson,* 462 U.S. at 843, 103 S.Ct. at 2696 ("[T]he Court in *Reynolds v. Sims* ... sin-

gled out preservation of political subdivisions as a clearly legitimate policy.").

Plaintiffs particularly concede that:
"This interest is clearly cognizable.... Each of the five vestigial county government[s] constitutes a political subdivision of the City ... deserv[ing] to have its integrity respected. ... As long as the chief executives of the county governments are representatives on the Board, there will be no necessity to compromise the integrity of these subdivisions."
Aff. of Richard Emery and Ex. in Support of Summary Judgment at 34–35. *See generally Greenwald v. Board of Supervisors of the County of Sullivan,* 567 F.Supp. 200, 210 (S.D.N.Y.), *aff'd,* 742 F.2d 1434 (2d Cir.1983) ("New York's public policy to 'maintain municipal boundary lines in the [apportionment] of counties for representation purposes' is a 'legitimate consideration'....") (brackets by *Greenwald* court). The court subscribes to the parties' agreement.

### Effectiveness

### (Numbers 4, 8, 10, 11, 12, 13 and 14)

Effectiveness, the "ab[ility] to accomplish a purpose," Webster's Third New International Dictionary at 724, is an objective which the State has expressly embraced.
"Effective local self-government and intergovernmental cooperation are purposes of the people of the state."
N.Y. Const. art. IX, § 1 (McKinney 1969). *See also* N.Y. Exec. Law § 150 (McKinney 1982) ("The future welfare of the state depends in large measure on the effectiveness of local government and of its relationships to state government....").

From 1901, the Board has been composed of those elected borough and city-wide officials with the greatest metropolitan influence. That small, mixed assembly has proven conducive to accomplishing the Board's mission.
"The strength of the Board ... rests, in part, on its mission 'to direct the business of the City.' It is the ability to

resolve policy and priority disputes that characterizes the Board's ... preeminent position in the city government. The members ... each publicly elected, each with a broad and diversified constituency, and each in an executive position ..., represent a far greater consensus than any other executive body. Their relatively small number enables them to act more decisively than most legislatures." Kramarsky Study at 16. *See, e.g.,* Aff. of Edward I. Koch at 1 ("[T]he Board operates very effectively ... in helping to govern this complex city. Indeed, in the mid–1970's, the Board struggled with—but weathered—the most serious fiscal crisis with which any major American city has had to grapple in modern history.").

Concomitantly, by interacting with the matters presented to it, the Board has accumulated experience, in turn, contributing to greater effectiveness.

"The resources of the City ... are limited, though the demands made ... are infinite. Therefore, resource allocation is necessary. The Board ... is the one [body] which has developed systems and expertise in the resolution of conflict between local and city-wide interest." Kramarsky Study at 102. *See, e.g., id.* at 66 ("[The Board] ... possesses the intangible advantage of almost 70 [now over 80] years of experience with franchise questions...."). *See generally* New York State Charter Revision Commission Report at 84 (1975) ("[The Board] has been a magnet for issues that require deliberative

judgments in the best interests of the City as a whole, and it has repeatedly been assigned responsibility for sensitive matters ... not ... adequately handled by other bodies or officials.").

For the most, the litigants once again join, agreeing that the Board is effective.[5] *See* Charo, 53 Fordham L.Rev. at 739 ("[T]he Board represents a concentration of legislative, executive and administrative power in the hands of the eight most preeminent local officials ... making it efficient and effective...."). *Cf. Franklin v. Krause,* 32 N.Y.2d 234, 344 N.Y.S.2d 885, 888–89, 298 N.E.2d 68, 70 (1973), *appeal dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974) ("[Nassau County's] small board ... is the most efficient form of government, and has proved to be such over the years.").

The court concurs, adding that, with regard to the Board, effectiveness is "a satisfactory explanation grounded on [an] acceptable state policy." *Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967).[6]

*Meaningful Representation of Smaller Boroughs in Board Affairs (Numbers 3, 4, 7, 9, and 14)*

Meaningful representation, another suggested concern, poses a formulation problem. *See generally* Note, *Fair and Effective Representation: Power to the People,* 26 Hastings L.J. 190, 206 (1974) ("Fair and effective representation defies precise defi-

---

**5.** Amicus Citizens Union demurs, basically making two objections. First they call into question the concept's nonspecificity. The dictionary meaning, however, is a serviceable enough yardstick. Second they challenge the Board's performance. *See e.g.,* New York State Charter Revision Commission Report at 86 (1975) ("Some public criticism ... is directed at [Board] procedures alleged to be unresponsive, inconvenient or undemocratic.") *But see* Kramarsky Study at 20 ("Much ... criticism ... is directed at procedures.... More often than not, the real objection is to the decision of the Board rather than to the method of achieving it."). Despite accounting for such criticism, this fact remains: The Board has been generally commended for the very effectiveness that even plaintiffs early on admitted. *See Morris v.*

*Board of Estimate,* 592 F.Supp. at 1476 n. 18, 1477 n. 20.

**6.** As with the rejected police power consideration, effectiveness, at least on the surface, suffers some overbreadth. But the Board's competence has been attested to and—importantly—contrasted with other civic bodies. *See e.g.,* New York State Charter Revision Commission Report at 18 (1900); New York State Charter Revision Commission Report at 84 (1975). This goal, in short, has not been attained by all local governmental institutions. That narrowing distinction renders the *Board's* effectiveness an "explicit, precise" concern meriting validation. *Karcher v. Daggett,* 462 U.S. at 734 n. 6, 103 S.Ct. at 2660 n. 6.

nition."). For defendants, meaningful representation of smaller boroughs is evidently Board voting equivalence with larger boroughs. As previously noted, the one borough, one vote notion is antithetical to the one person, one vote rule. The smaller boroughs must settle for less. *Cf. Morris v. Board of Estimate*, 707 F.2d at 691 ("[T]he fact that a minority may regularly be overshadowed by its more populous neighbors under a proportional voting scheme is one characteristic of a representative democracy.").

> Plaintiffs, in contrast, point out that: "Meaningful representation for the lesser populated boroughs is achieved when their borough presidents have influence and power over Board decisions [, approximately in proportion to population represented]."

Aff. of Richard Emery and Ex. in Support of Summary Judgment at 38.[7] *See generally Iannucci v. Board of Supervisors of the County of Washington*, 20 N.Y.2d 244, 282 N.Y.S.2d 502, 508, 229 N.E.2d 195, 199 (1967) ("[In a weighted voting system, t]he principle of one man-one vote is violated ... when the power of a representative to affect the passage of legislation by his vote ... does not roughly correspond to the proportion of the population in his constituency.").

So understood, meaningful representation is a cognizable objective, given the Board's small borough membership. *See Morris v. Board of Estimate*, 592 F.Supp. at 1476–77 (authorities therein). *See generally Brown v. Thomson*, 462 U.S. at 843, 103 S.Ct. at 2696 ("There ... can be no question that Wyoming's constitutional policy—followed since statehood—of using

counties as representative districts and ensuring that each county has one representative is supported by substantial and legitimate state concerns.").

*Checking the Mayor, and Supplementing the City Council (Numbers 7, 14 and 15)* [8]

The offsetting of power among coordinate institutions is a fundamental of American democracy. *See United Public Workers v. Mitchell*, 330 U.S. 75, 91, 67 S.Ct. 556, 565, 91 L.Ed. 754 (1947) ("By these mutual checks and balances ... democracy undertakes to preserve the liberties of the people from excessive concentrations of authority."); *Youngstown Co. v. Sawyer*, 343 U.S. 579, 593, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952) ("[The nation's founders] rested the structure of our central government on the system of checks and balances. For them the doctrine of separation of powers was not mere theory; it was a felt necessity.") (Frankfurter, J., concurring).

The separation of powers' principle is not limited to the federal government but, as the New York Court of Appeals has made clear, is applicable to this State, and, as modified, to this City.

> "One of the fundamental principles ... underlying our Federal Constitution is the distribution of governmental power into three branches—the executive, legislative and judicial—to prevent too strong a concentration of authority in one person or body.... We have consistently recognized that this principle of separation of powers among the three branches

---

**7.** The essence of the bracketed portion is contained in a weighted voting discussion immediately after the quoted sentence. *See id* at 39. It should be stressed, though, that proportionality is certainly not mandated by the Constitution. *See Davis v. Bandemer*, — U.S. —, 106 S.Ct. 2797, 2809, 92 L.Ed.2d 85 (1986) ("Our cases ... clearly foreclose any claim that the Constitution requires proportional representation....").

**8.** Plaintiffs do not take-up in their policies and interests analysis section the Board supplement-

ing the City Council, a consideration limited by the court to mean providing a forum for borough-wide representation. *See infra* pp. 1475–76 & note 9. Plaintiffs do briefly address this objective before, acknowledging it as "no doubt true." Aff. of Richard Emery and Ex. in Support of Summary Judgment at 26. In not amplifying on the Board-City Council relationship, plaintiffs have failed as well to list the related concerns (Numbers 7 and 14). The court has done so.

is included by implication in the pattern of government adopted by the State....

...

Of course, the pattern of government established for New York City by the City Charter is not identical to that of the United States or the State.... Still, the City Charter does provide for distinct legislative and executive branches.... Thus, our prior decisions have held that ... the Mayor may not unlawfully infringe upon the legislative powers reserved to the City Council...."

*Under 21 v. City of New York*, 65 N.Y.2d 344, 492 N.Y.S.2d 522, 525–26, 482 N.E.2d 1, 4 (1985) (The Mayor usurped the City Council's legislative power by promulgating an Executive Order barring City contractors from discriminatory employment practices involving "sexual orientation or affectional preference."). *See also Subcontractors Trade Assoc. v. Koch*, 62 N.Y.2d 422, 477 N.Y.S.2d 120, 124, 465 N.E.2d 840, 844 (1984) (Under a separation of powers analysis, the New York Court of Appeals held that the Mayor encroached on the City Council's legislative terrain by issuing an Executive Order directing that small, local businesses share 10% of City construction contracts.).

While not a formal executive or legislative branch member, the Board, with its county contingent participating, assists in markedly curbing extradepartmental ascendancy. The Mayor, in particular, is checked, since having no budget and only two Board votes his role is limited. *See generally* W. Sayre & H. Kaufman, Governing New York City at 651 (1960) ("[T]he Board is not often led by the Mayor; instead, it unites against him if necessary, absorbs him into the Board as a member without special status if it can."). That circumscribed influence in a prominent political body curbs the Mayor *in general*. *See id.* at 632 ("The Mayor's membership on the Board is an asset to the Board, a liability to the Mayor.").

Along with restraining the Mayor, the Board supplements the City Council's role by providing a major forum for Borough Presidents to voice county interests.[9] *See, e.g., Andrews v. Koch*, 528 F.Supp. at 251 (This court noted, among other avenues, that "channel[ ] of communication ... between the boroughs and City Hall.") *See generally Reynolds v. Sims*, 377 U.S. at 580, 84 S.Ct. at 1391 ("A consideration that appears to be of more substance in justfying some deviations ... is that of insuring some voice to political subdivisions....").

In sum, the Board, structurally embodying a county faction, counterbalances to an unusual extent the Mayor as well as supplementing the City Council. Those last suggested policies and interests "are consistent with constitutional norms." *Karcher v. Daggett*, 462 U.S. at 740, 103 S.Ct. at 2663.

### 2. *Furtherance Issue*

Validating the foregoing policies and interests lightens but does not relieve defendants of their burden of justification. They must also demonstate that no alternative plan would satisfactorily embrace the legitimate considerations and diminish the deviation. If another alternative would do so, then the present plan "may [not] reasonably be said to advance" the accepted goals. *Mahan v. Howell*, 410 U.S. at 328, 93 S.Ct. at 987.

In *Karcher v. Daggett*, 462 U.S. at 741, 103 S.Ct. at 2663, the Supreme Court reconfirmed that options are within the justification stage.

"The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan ... reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely."

9. Intervenor defendant Straniere regards these two political bodies from another vantage point, the Board supplementing the City Council's *powers*. Given the Board's stature, that seems a minimizing misperception.

*See also id.* at 742 n. 12, 103 S.Ct. at 2664 n. 12 (In holding unconstitutional New Jersey's congressional reapportionment plan with disparities unrelated to the professed objective of preserving racial minority voting strength, the Supreme Court noted that at oral argument the State had suggested other considerations. After pointing out that those were not properly before it, the Supreme Court continued: "Furthermore, several plans before the Legislature with significantly lower population deviations [enveloped those aims].").

Confusing alternatives with remedies, defendants disavow the formers' relevance. *See, e.g.*, Attorney's Aff. of Susan R. Rosenberg at 1 ("[A]ll this discussion is premature and ... inappropriate. The issue before the Court is not remedy, but the underlying merits.").

■ To the contrary, scrutinizing alternatives—not remedies—is undeniably appropriate at this point. *See e.g., Kilgarlin v. Hill*, 386 U.S. at 123–24, 87 S.Ct. at 822–23 (quoted *supra* p. 1466); *Travis v. King*, 552 F.Supp. 554, 561–62 (D.Hawaii 1982) ("Assuming [Hawaii] could have drawn districts of equal populations ...— and no evidence to the contrary was presented—the maximum deviations ... would have been substantially reduced. ... Based on this substantial and wholly unjustified increase in total deviation, we find that the state plan, as it relates to the state house of representatives, fails to reasonably further the state's expressed policy and is thus unconstitutional.").

Plaintiffs recognize the reasonableness of examining other schemes, having all along suggested plans that incorporate the accepted aims while reducing the disproportion.[10] *See Connor v. Finch*, 431 U.S. 407, 420, 97 S.Ct. 1828, 1836, 52 L.Ed.2d 465 (1977) (In rejecting a more strictly inspected court plan with a 16.5% deviation, the Supreme Court said that, "[P]laintiffs ... submitted ... an alternative [Mississippi] Senate plan that served the state policy

against fragmenting county boundaries better than did the plan the court ultimately adopted, and [with a 13.66% variance] also came closer to achieving districts that are 'as nearly of equal population as is practicable.' *Reynolds v. Sims*, [377 U.S.] at 577 [84 S.Ct. at 1390].").

As one example, plaintiffs point to a weighted voting system keeping the Board's form but reworking its ballot allocation to correlate with the markedly unequal borough populations. Developed by Professor Steven J. Brams, whose expertise was noted in *Morris v. Board of Estimate*, 592 F.Supp. at 1474, this option has 7.8% whole and 18.2% budget Board inequalities.

Professor Lee Papayanopoulos, who has been retained by over thirty county boards of supervisors to assign computer derived voting weights to representational plans, endorses Professor Brams' design, emphasizing that:

"These very interests are ... of substantial concern to the participants in most of the schemes I have designed.... The towns which comprise New York counties each have their own history, boundaries, integrity, desire for a voice, need not to be dominated and desire to have effective county government. ... [E]very town has an overriding concern that county government will respect its special needs and integrity.

... [T]his is accomplished ... by ... a weighted voting scheme. Weighted voting schemes parcel out voting power ... in a manner that guarantees each town its fair share, its voice on the critical votes. Because every town representative knows that he or she has a meaningful share of the critical votes, deference and collegiality develop which usually avoid close (critical) votes. But when critical votes do occur every town knows that its voice means something.

Aff. of Professor Lee Papayanopoulos at 3–4. *Cf. Franklin v. Krause*, 32 N.Y.2d

---

**10.** Plaintiffs, in fact, do not maintain that *all* their suggested alternatives advance *all* the credited aims. *See* discussion *infra* p. 1478. Nor do

plaintiffs have to. *See Karcher v. Daggett*, 462 U.S. at 741, 103 S.Ct. at 2663 (quoted *supra* p. 1467).

234, 344 N.Y.S.2d 885, 889, 298 N.E.2d 68, 70 (1973), *appeal dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974) ("[T]o preserve unit boundary lines and the concomitant efficiency in the rendition of local services, without creating a monstrous legislative body, virtually necessitates a weighted voting system [for Nassau County's Board of Supervisors] which can approach *as closely as possible* the one man, one vote principles....") (emphasis in original).

Although rejecting the relevance of alternatives, defendants attempt some rebuttal. For instance, they maintain that weighted voting ignores the relationship between the at-large and borough contingents.

To explain, under Professor Brams' system, the city-wide members would have twenty votes apiece, in the aggregate sustaining their majority status. The borough delegates would be assigned votes by population, with the Staten Island representative at one end receiving three and the Brooklyn representative at the other receiving sixteen. Critical of such a distribution, city defendants question:

> "Does it really make sense that [the Brooklyn] borough president, representing 31.5% of the City's population, should have 80% of the voting power of the Mayor, Comptroller [or] City Council President, all of whom have been elected by the City as a whole?"

Attorney's Aff. of Susan R. Rosenberg at 2–3.

Adopting, for the moment, city defendants' perspective (*i.e.,* in measuring the deviation, the at-large and borough votes should be collectively assessed), the answer is that it makes as little or as much sense as—under the present plan—allocating to the Staten Island Borough President 50% of a city-wide official's ballot strength when he represents roughly 5% of the metropolitan population. The question is nonsensical because it derives from a faulty formula for calibrating the Board's composite mode, and simply highlights the analytical pitfalls of gauging together the distinct delegate sets.

Professor Brams, consistent with his previous approved refusal to disperse the city-wide members' conjectured vote influence among the boroughs, *see Morris v. Board of Estimate,* 592 F.Supp. at 1474 & n. 15, again separates the two representational tiers to calculate the suggested plan's disparity. The court, as before, agrees with that methodological perspective and rejects city defendants' restated criticism.

Intervenor defendant Straniere and amicus Marchi chiefly protest that the smaller boroughs would have no say under Professor Brams' suggested weighted voting system. Professor Papayanopoulos, however, has met that complaint. *See also Greenwald v. Board of Supervisors of the County of Sullivan,* 567 F.Supp. 200, 203 (S.D. N.Y.), *aff'd,* 742 F.2d 1434 (2d Cir.1983). ("Adjusted weighted voting has been recognized as a means of overcoming malapportionment ... in local legislative bodies and to assure that sparsely populated areas ... have a voice in the councils of government."); Lijphart, *Comparative Perspectives on Fair Representation: The Plurality-Majority Rule, Geographical Districting, and Alternative Electoral Arrangements* at 150, in Representation and Redistricting Issues (B. Grofman ed. 1982) ("One of the main advantages of weighted voting is to give representation to small districts without violating equal per capita representation and without making the legislature too large....").

Besides the weighted voting option, plaintiffs have suggested other alternatives, several founded on a proportional representation structure (each borough having delegates corresponding to population) coupled with three respective methods of electing those individuals (adjusted district voting, limited voting and successive approval voting).

It would appear that proportional representation would more closely honor the one person, one vote dictate. *See* Still, *Political Equality and Election Systems,* 91 Ethics 375, 384 (1981) ("[Theoretically, under that system,] each group ought to be represented in the same relative numbers

as it would be if the entire electorate were to meet as a direct democracy.") Also, depending on the process employed, proportional representation would advance some accepted objectives, since (except for adjusted district voting) borough-wide representation would be retained.

Noting that a proportional representation system was brought up before in this suit, city defendants comment that it "received a negative reaction as expensive, cumbersome and essentially duplicative of the City Council." Attorney's Aff. of Susan R. Rosenberg at 2. The adverse response was not unmerited as even plaintiffs admit, since Board membership would increase to at least nineteen, thereby negating "the legitimate interest in preserving the small size of a Board." Aff. of Richard Emery and Ex. in Support of Summary Judgment at 42 n. 20.

Straniere mainly complains that with proportional representation the boroughs would be carved into districts (each approximately Staten Island's population) causing the City's "balkanization" and preventing the Board's ability to continue "as an efficient and effective governing body for this extremely diverse City." Aff. of Robert A. Straniere at 21–22. At least as to physical subdividing, Straniere is only partially correct. That would occur with adjusted district voting—not with the other suggested procedures. More importantly, even that choice would appear preferable to the current plan with its enormous deviation.

Finally, plaintiffs have previously mentioned other possible designs. One such substitute, which might sufficiently promote the identified goals and comport with equal protection, is a borough residency requirement comparable to that cautiously allowed in *Dusch v. Davis*, 387 U.S. 112, 114–15, 87 S.Ct. 1554, 1555–56, 18 L.Ed.2d 656 (1967). Defendants have not critiqued this option.

■ Summarizing the furtherance issue, alternatives have been suggested that would "substantially vindicate" the accepted policies and interests "yet approximate population equality more closely." *Karch-*

*er v. Daggett*, 462 U.S. at 741, 103 S.Ct. at 2664. *See also Connor v. Finch*, 431 U.S. at 420, 97 S.Ct. at 1836. The existing plan with its much greater departure from franchise equality does not advance the valid policies and interests. *See Mahan v. Howell*, 410 U.S. at 328, 93 S.Ct. at 987. *Kilgarlin v. Hill*, 386 U.S. at 123–24, 87 S.Ct. at 822–23.

That being so, defendants have failed to carry their requisite justification burden. *See Karcher v. Daggett*, 462 U.S. at 741–42 & n. 12, 103 S.Ct. at 2664–65 & n. 12; *Travis v. King*, 552 F.Supp. at 561–62. *See also Cosnor v. Dalton*, 522 F.Supp. 350, 358–59 (E.D.Va.1981). Accordingly, since equal protection is transgressed by the unexcused malapportionment, the Board's voting plan under sections 61 and 62 of the New York City Charter is held to be unconstitutional.

## II. *Remedy*

Based on the foregoing, the Board's voting plan must be recast. That is a legislative task, the judiciary's role being restricted to seeing that a constitutional plan is enacted in a timely manner. *See Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is ... appropriate ... to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure.... The new legislative plan ... will then be the governing law unless it, too, is challenged and found to violate the Constitution.")

Consistent with its circumscribed role, the court underscores that, while the preceding justification discussion noted the availability of possible alternatives, by no means are they recommended for implementation. *See e.g., Chapman v. Meier*, 420 U.S. 1, 25–26, 95 S.Ct. 751, 765–66, 42 L.Ed.2d 766 (1975). ("Special Master Ostenson['s devised model] demonstrates that [certain asserted concerns do not]

prevent[ ] attaining a significantly lower population variance. *We do not imply that the Ostenson plan should be adopted by the District Court....* What we intend ... is to show that th[ose] factors ... cannot be viewed as ... persuasive when other, less statistically offensive, plans already devised are feasible.") (emphasis added).

## CONCLUSION

During this justification stage, defendants have proposed numerous policies and interests that are valid in relation to the Board. Plaintiffs, however, have presented alternative plans that appear to respond to the accepted objectives and decidedly decrease the variance; necessarily, the current legislative plan does not further those legitimate aims. Defendants, as a result, have not justified the Board's present ballot allocation with its large 132.9% deviation from the one person, one vote rule.

Therefore, the court grants plaintiffs' motion for summary judgment and declares sections 61 and 62 of the New York City Charter violative of the equal protection clause of the fourteenth amendment to the United States Constitution. To remedy that illegality, city defendants are enjoined to undertake curative measures with all deliberate speed, allowing for likely appeals. The Board, in the meantime, shall continue to perform its duties under the present plan.

SO ORDERED.