OPINION OF THE COURT
Peter P. Cusick, J.
Subsequent to the commencement of this special proceeding, the parties hereto stipulated that this litigation be discontinued with prejudice as to petitioner Guy V. Molinari only. Accordingly, he is no longer a party to this proceeding notwithstanding the presence of his name in the caption herein-above.
By order to show cause and verified petition, the movants Robert A. Straniere, Susan Molinari, and Staten Islanders Opposed to the Prison (S.T.O.P., Inc.) seek an order of this court enjoining and restraining the respondents cited in the caption hereinabove from taking any further action toward the selection and acquisition of a certain site approved by the New York City Board of Estimate for future construction of the Staten Island Correctional Facility (the Project). They also seek to restrain respondents from taking further action for the development and construction of the Project until compliance, as perceived by petitioners, with various environmental laws has been completed.
Pursuant to the uniform land use review procedures (ULURP) of the New York City Charter (NY City Charter § 197-c), on March 30, 1989, the Board of Estimate approved applications for the Project after public hearings were conducted. These petitioners and others appeared before the Board, which had the final environmental impact statement (FEIS) before it.
The petitioners propound three main arguments in support of their request for relief. The court will address each seriatim, and it will discuss essential facts culled from the papers and documents submitted, where appropriate.
1. THE AUTHORITY OF THE BOARD OF ESTIMATE TO ACT.
*716 The petitioners assert that the New York City Board of Estimate had no legal authority to approve the Project. In support, they rely on the series of decisions in the Federal courts leading to the United States Supreme Court’s landmark holding on March 22, 1989 in Board of Estimate v Morris (489 US —, 109 S Ct 1433), which affirmed the Second Circuit Court of Appeals judgment (831 F2d 384) that the Board of Estimate’s structure was unconstitutional as violative of the one person, one vote principle. A reading of Mr. Justice White’s opinion reveals that the Supreme Court gave no directions to the lower courts regarding stays, injunctions, or the power of the Board of Estimate to act before curative measures are implemented; it merely affirmed the Second Circuit’s opinion on the constitutional issue. Thus, the Second Circuit appears to have had the final say on the matter, and this court must ascertain its intent from the published decisions.
Petitioners take the position that the Board’s approval of the Project one week after the Supreme Court’s decision in the Morris case (supra) renders said action, and all other actions, a nullity. They rely on the following language of the Second Circuit opinion in affirming the District Court (Neaher, J.): "On the basis of the thorough analysis and reasoning of Judge Neaher in Morris v. Board of Estimate, 647 F. Supp. 1463, 1479, we affirm his judgment which very wisely enjoined the city defendants to undertake curative measures 'with all deliberate speed.’ We understand that they are doing so, and when this case returns to the district court, we hope that an appropriate remedy will be proposed accordingly. In the meantime, though flawed, the Board of Estimate may continue to function. Six months should be a target area, one year a deadline. ” (Morris v Board of Estimate, 831 F2d 384, 393 [2d Cir 1987], supra; emphasis added.)
The court agrees with the view of the municipal respondents herein, that this language is merely an "exhortation to prompt curative action, [and] not an injunction staying the BOE from governing after a certain date.” It is improbable that the Second Circuit intended that the City of New York suddenly function without a governing body authorized to exercise important governmental functions such as land use decisions, contract and franchise approval, zoning changes, and budget recommendations. Also noteworthy is the fact that these municipal respondents successfully moved before the Second Circuit for an order recalling the mandate set forth *717 hereinabove. To this court’s knowledge the order of that court dated June 9, 1988 has never been modified or vacated. Apparently, the municipal respondents have moved with all deliberate speed envisioned by the Federal courts. Revisions to the city’s charter eliminating the offending provisions thereto were approved at the general election immediately following the Supreme Court’s decision, and they provide a timetable for transition of authority and ultimate elimination of the Board of Estimate.
For the reasons cited above, this court concludes that the Board of Estimate had proper authority to pass upon the application for approval of the Project in question.
2. COMPLIANCE WITH THE STATE ENVIRONMENTAL QUALITY REVIEW ACT (SEQRA) AND RELATED STATUTES.
Petitioners also assert that it was improper for the Department of Environmental Protection (DEP) and the Department of City Planning (DCP) to act as "lead agencies” for the implementation of the environmental quality review procedures set forth in SEQRA (ECL art 8).
SEQRA requires, at section 8-0109, that all local agencies prepare, or cause to be prepared, an environmental impact statement for any proposed actions which may have a significant impact on the environment. Also embodied in the legislative scheme of SEQRA is the concept of the "lead agency”: "When an action is to be carried out or approved by two or more agencies, the determination of whether the action may have a significant effect on the environment shall be made by the lead agency having principal responsibility for carrying out or approving such action and such agency shall prepare, or cause to be prepared by contract or otherwise, the environmental impact statement for the action if such a statement is required by this article.” (ECL 8-0111 [6].) The regulations (6 NYCRR 617.2 [v]) further define "lead agency” as "an agency principally responsible for carrying out, funding, or approving the action.” The City Environmental Quality Review, or "CEQR” (NY City Executive Order No. 91) designated DEP and DCP as the permanent lead agencies for the preparation and drafting of the environmental impact statement (EIS), whether draft or final, for all New York City agency actions.
Petitioners contend that the designation of DEP and DCP as lead agencies for purposes of preparing the EIS was an improper delegation of authority since they have no final authority over the approval of the project, which was granted to the *718 Board of Estimate by section 67 of the New York City Charter. Petitioners cite Glen Head — Glenwood Landing Civic Council v Town of Oyster Bay (88 AD2d 484 [2d Dept]) in support of their contention on this point of law. The Glen Head case is clearly distinguishable on its facts. The Town Board created an environmental quality review commission, and impermissibly delegated to it all decision-making responsibilities regarding environmental findings (ECL 8-0109 [8]).
Similarly, the reliance upon the Court of Appeals decision in Matter of Coca-Cola Bottling Co. v Board of Estimate (72 NY2d 674) is misplaced. In Coca-Cola, the Board of Estimate improperly gave the DEP the authority to make the final determination as to whether an EIS was required at all for the project at issue therein (ECL 8-0109 [4]). The DEP determined in Coca-Cola that no EIS was required for a proposed recycling business. Such is not the case sub judice.
Here, the Board of Estimate, by approving the Project, made the final determination that an EIS was required, and in fact the Board had the final EIS before it for review and consideration. The New York City Department of Correction caused a consultant to prepare the draft EIS under the technical supervision of DEP and DCP. Thus, the facts of this case fall more squarely with those in the recent decision of the First Department in Akpan v Koch (152 AD2d 113, 120) wherein it was held: "Based upon our review of the record, we find nothing wrong with the use by the BOE and CPC, which were the ultimate decision-makers concerning the [project], of the lead agencies, DEP and DCP, as investigative arms, since those agencies had the technical expertise necessary to prepare a DEIS and FEIS.” The First Department then relied on the following succinct language from the Court of Appeals in Matter of Jackson v New York State Urban Dev. Corp. (67 NY2d 400, 427): "Nothing in SEQRA bars an agency [which has the ultimate decision-making authority] from relying upon information or advice received from others, including consultants or other agencies, provided that the reliance was reasonable under the circumstances.”
This court is in accord with the above-quoted conclusions as they relate to the issues submitted. The Board of Estimate held a public hearing at which these petitioners and others gave testimony; the Board members had the final EIS before them containing all written and oral comments on the Project raised during the review process. Other technical information regarding soil and groundwater testing and analysis prepared *719 by DEP was presented to the Board before its final determination was made. The Akpan decision (supra) makes it clear that the BOE had a right to rely on the EIS prepared by those agencies with technical expertise at their disposal, so long as it reserved the final authority on approval or disapproval of the Project. The letter and spirit of SEQRA are satisfied by this process.
3. THE SUFFICIENCY OF THE FEIS.
Petitioners claim that the FEIS is fatally deficient in that it fails to address issues which are required to be addressed under SEQRA and CEQR. They concede that this court may not substitute its judgment for those of the elected and appointed officials charged with the responsibility of making such decisions. They argue that the decision-making process was not in conformity with the procedures set forth in SEQRA and CEQR, and thus meets the "arbitrary and capricious” standard of CPLR 7803 (3),
Specifically, petitioners claim that respondents failed to consider alternatives to the project (ECL 8-0109 [2] [d]). They claim that respondents made only a perfunctory consideration of alternate sites, and did not take a "hard look” at the relevant areas of environmental concern (see, H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232). They further contend that subsequent to the preparation of the DEIS the municipal respondents significantly reduced the size of the Project, requiring the preparation of a revised DEIS to consider additional alternative sites.
However, the record adequately demonstrates that during the site selection process 23 other sites were considered and evaluated by the respondents. They were weighed by reasonable and proper considerations such as size, access to public transportation, utilities, vehicular access, zoning restrictions, compatibility with neighborhoods, legal obstacles to acquisition, and soil conditions. For example, the Spring Creek-East and Paerdegat Basin sites in Brooklyn and the Pelham Bay Park Extension site in The Bronx are located in or near wetlands. The Fort Totten site in Queens is a military facility and the Federal Government has withheld it for other uses. Other projects are being developed for the Rockaway and Arvene Urban Renewal Area sites in Queens and the South Brooklyn Marine Terminal and 65th Street Rail Yards in Brooklyn. Contrary to petitioners’ claims, the other sites were not listed merely to give the illusion of serious consideration. *720 Several other sites were large enough, properly zoned, accessible to transportation, etc. Of the 23 other sites analyzed, it was determined that four merited further consideration. They were Hart Island and the Truck Stop in The Bronx, the Brooklyn Army Terminal, and Floyd Bennett Field. However, it was determined that these sites were significantly encumbered by problems which would disallow their use.
It must be remembered that every possible alternative need not be discussed in an EIS. It must be "analytical” but need not be "encyclopedic” (Matter of Environmental Defense Fund v Flacke, 96 AD2d 862, 864 [2d Dept]).
Furthermore, petitioners can point to no rule of law, statute, or regulation which required the municipal respondents to reopen the site selection process when a determination was made to develop a 1,000-bed facility only. The respondents took the requisite "hard look” at the alternatives during the site selection process, and reevaluated them again when the decision to develop a 1,000-bed facility was made. After the reevaluation, the factors which eliminated the other sites still existed, and the Rossville site remained the most viable one for the Project. It must also be remembered that throughout the ULURP review process, the application under consideration was for a 1,000-bed facility. The capability to expand the facility was but one factor in the selection of the site.
Petitioners next contend that the FEIS fails to adequately consider the socio-economic impact on the community. They characterize the FEIS’ "Land Use/Zoning Study” as one which describes the surrounding neighborhood as an "older, industrialized, unappealing neighborhood.” However, the FEIS also acknowledges that there are newly developed residential tracts nearby. It contains a demographic profile of the surrounding neighborhood, and detailed statistics about the population. Though reasonable persons may differ as to the conclusions to be reached from the socio-economic data contained in the FEIS, reasonable doubts should be resolved in favor of administrative findings (Matter of Town of Henrietta v Department of Envtl. Conservation, 76 AD2d 215).
Similarly, the EIS reviews and discusses the environmental impacts with respect to the ecology, traffic, prison demographics, and available medical care for the Project, and incorporates as conditions mitigative measures that were identified as practicable to minimize or avoid any adverse environmental impacts. The respondents identified the relevant areas of *721 environmental concern, took the required "hard look” at those issues in the FEIS, considered the reasonable alternatives and identified the practicable mitigative measures. The data contained in the EIS and the mitigative measures proposed provide a rational basis to support the Board’s determination (see, Matter of Schiff v Board of Estimate, 122 AD2d 57 [2d Dept]), notwithstanding that other data might be available to support other conclusions.
Finally, the court is satisfied that none of the actions heretofore taken by the municipal respondents violate the letter and spirit of either the Waterfront Act (Executive Law art 42) or the New York City Waterfront Revitalization Program. The City Planning Commission, in its capacity as the City Coastal Commission, reviewed the proposed project and found it was consistent with the policies of the New York City Waterfront Revitalization Program. There is nothing to support petitioners’ conclusions that these waterfront revitalization statutes require only water-dependent activities within designated waterfront areas.
Petitioners concede they cannot and do not ask this court to substitute its judgment for that exercised by the municipal respondents. This is a vital consideration which deserves emphasis. The court cannot substitute its own judgment for that of the body, board or officers empowered by law to make such determinations, if the record shows that there was such relevant evidence to support the conclusion reached (Matter of 330 Rest. Corp. v State Liq. Auth., 26 NY2d 375; Matter of Purdy v Kriesberg, 47 NY2d 354). The court cannot weigh the evidence in order to determine whether the agency or board reached a proper conclusion (Matter of Carlan v Board of Educ., 128 AD2d 706 [2d Dept]; Matter of Furey v Suffolk County, 105 AD2d 41 [2d Dept]). Even if the court is of the opinion that a better solution can be reached, it is prohibited from substituting its own judgment (Peconic Bay Broadcasting Corp. v Board of Appeals, 99 AD2d 773, lv denied 62 NY2d 603).
There is no doubt that reasonable persons may argue, in a persuasive fashion and supported by empirical data, that the Project is better suited elsewhere. In the final analysis, the "best” location, if any, for the Project is a matter of judgment, and the exercise of that judgment lies elsewhere. This is not the forum for such a debate. It is not the role of this court to weigh the desirability of the action or to choose among alternatives. Whether this court might reach a different conclusion *722 is not the issue. This court’s authority is limited to determining whether the environmental laws and other statutes have been complied with by the municipal respondents. For the reasons discussed at length, this court finds that there has been such compliance, and that the Board’s action was not arbitrary and capricious or an abuse of discretion. Consequently, the court’s inquiry ends here. The decisions concerning the location, size, and purpose of the Project must be left to those experts and officials entrusted by the public to make them.
The petition is denied in all respects.